State of Wisconsin, Plaintiff-Respondent,

v.

Felicia Morgan, Defendant-Appellant.†

Court of Appeals

*No. 93–2611–CR. Submitted on briefs July 7, 1994.—Decided June 20, 1995.*

(Also reported in 536 N.W.2d 425.)

†Petition to review denied.

392

393

For the defendant-appellant the cause was submitted on the briefs of *Robin Shellow* of Milwaukee.

For the plaintiff-respondent the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *G.M. Posner-Weber*, assistant attorney general.

Before Wedemeyer, P.J., Sullivan and Schudson, JJ.

SULLIVAN, J. Felicia Morgan appeals from a judgment of conviction, after a bifurcated jury trial, for one count of first-degree intentional homicide, while armed, as a party to a crime; one count of attempted armed robbery, as a party to a crime; and five counts of armed robbery, as a party to a crime.[1] After an over-

---

[1] Although the jury convicted Morgan of five armed robberies, one attempted armed robbery, and one first-degree

view of the issues raised by Morgan on appeal and an explication of the undisputed facts, we address each of the four issues Morgan raises *seriatim*. A more detailed discussion of the facts relevant to each issue is set forth in the appropriate section below.

Morgan presents four issues for our review. The first two arise out of the first phase of her bifurcated trial:

> 1. Did the trial court erroneously exercise its discretion by excluding expert psychiatric and psychological testimony on post-traumatic stress disorder and expert and lay testimony on Morgan's psycho-social history?
> 2. Did the trial court err by denying Morgan's requested lesser-included offense jury instruction for first-degree reckless homicide?

The last two issues arise out of the second phase of her bifurcated trial:

> 3. Did the trial court violate Morgan's constitutional right to present a defense by excluding the expert testimony of a psychologist from the responsibility phase of her bifurcated trial on the grounds that it was irrelevant and cumulative to evidence already presented?
> 4. Did the trial court err by refusing to give Morgan's "theory of the case" special instruction to the jury?

After a careful review of the arguments presented by the parties and our own review of the applicable law, we conclude that there are no grounds for reversing

---

intentional homicide, each as a party to a crime, her claim of error on appeal is limited solely to the homicide charge. Thus, we need only address those facts that are relevant to disposition of this appeal relating to the homicide of Brenda Adams.

Morgan's judgment of conviction. Accordingly, we affirm.

## I. BACKGROUND

This case comes before us as a result of a senseless fifteen-minute crime spree carried out by seventeen-year-old Morgan and Manuella Johnson ("Marie"), a fifteen-year-old juvenile. Their crime spree left in its wake a trail of victims and ended with the homicide of Brenda Adams, a young woman who was shot and killed—ostensibly for the leather trench coat she was wearing.

In the early morning hours of October 26, 1991, Morgan, Johnson, and Kurearte Oliver were traveling in Oliver's car to a party. As they approached 35th Street and Villard Avenue in the City of Milwaukee, they passed three men standing by the street who called out to Oliver, "You see that white bitch back there? She got on a herringbone dog." Morgan knew this meant that the girl was wearing a gold herringbone necklace. Oliver then gave Morgan a small-caliber handgun that Johnson had supposedly stolen from her mother. Oliver told Morgan and Johnson to "get the herringbone for me."

Morgan and Johnson left the car and approached the girls. Morgan had the gun in her right-hand coat pocket. Suddenly, the three men who had originally yelled out to Oliver pushed Morgan aside and "jumped" the girl, stealing the necklace. Morgan went back to the car and told Oliver, "Them dudes beat me to it and got the herringbone." Johnson stated that she had stolen some shoes from one of the girls. Oliver said that he wanted to know where the three men went, so Morgan and Johnson got back into the car to search for the men.

As they were driving, they saw three girls and a boy walking down the street. Oliver asked them if they had seen the three men and they stated that they had not. As Oliver's car pulled away from them, Johnson said that she wanted the coat that one of the girls was wearing. Morgan and Johnson got out of the car, approaching the four youths. Morgan held out the gun, and she and Johnson then stole a necklace, the boy's coat, and a baseball hat from them.

They went back to the car and Oliver drove back to the 35th Street and Villard Avenue area where the party was located. Oliver saw his friend "T.C." and stopped to talk to him. Johnson saw Brenda Adams standing near the street in front of the apartment in which the party was located. She stated, "I want that trench," pointing to Adams's leather trench coat. "T.C." told them not to bother Adams because he had danced with her earlier at the party. Oliver pulled the car around a corner and Morgan and Johnson exited. Before she shut the car door, Oliver handed her the gun again and told her, "Let Marie do what she got to do and don't let no niggers get into it."

What occurred next is disputed. Several witnesses at the scene (including Johnson) stated that Johnson and Morgan crossed the street and told Adams to "give up" her coat. Adams refused, and Johnson began fighting with her. Several people outside the party walked towards the fight and Morgan flashed the handgun, telling them to stay away. Morgan and Johnson fought with Adams until Adams was eventually pulled across the street. She was on the ground, slumped against a light pole when Morgan pointed the handgun near Adams's shoulder and fired one shot. Several witnesses heard other shots being fired and the police later found expended .38-caliber shell casings across the street

from where Adams was shot. Morgan and Johnson stole Adams's trench coat and then ran back to Oliver's car.

Morgan turned herself in to the police the following day and gave a different account of the events leading to Adams's homicide. Morgan stated that after Johnson dragged Adams across the street, Oliver and "T.C." pulled up in the car. Morgan stated that she heard shots being fired from across the street. Morgan closed her eyes and fired one shot, and when she opened her eyes, her arm was pointed at Adams's shoulder. She helped Johnson steal the coat and then she (Morgan) grabbed Adams's necklace. She saw blood running down Adams's shoulder and dropped the necklace. She then moved towards Oliver's car when she heard more gunshots from across the street. Morgan turned back and fired one more shot at Adams. She got in the car and they drove off. Adams died as a result of the gunshot wound.

Morgan was taken into custody and the State filed both a delinquency petition and a petition to waive Morgan into adult court. The juvenile court granted the waiver petition, Morgan waived her preliminary hearing, and the State filed a seven-count information charging Morgan with five armed robberies, one attempted armed robbery, and first-degree intentional homicide. Morgan entered pleas of not guilty and not guilty by reason of mental disease or defect and the case was set for a bifurcated trial.

Morgan filed a pretrial motion *in limine* through which she sought to introduce (during the first phase of her trial) expert and lay testimony on both post-traumatic stress disorder and Morgan's psycho-social history. The trial court denied the motion.

The jury found Morgan guilty of all counts in the first phase of her trial. During the second phase of her trial, Morgan presented two expert witnesses and several corroborating lay witnesses to support her claim that Morgan was not criminally responsible for her actions because she suffered from post-traumatic stress disorder and brief reactive psychosis at the time of the crimes. She also sought further testimony from another expert witness on the development of post-traumatic stress disorder in children living in foreign "war zones." The trial court excluded this testimony. After the State presented several expert witnesses challenging Morgan's claim, the jury, by a vote of ten-to-two, found that Morgan was not suffering from a mental disease at the time of the crimes. The trial court entered judgment and sentenced Morgan. She now appeals.

## II. PSYCHIATRIC AND LAY TESTIMONY IN GUILT PHASE OF TRIAL

We first address the issues arising out of the first phase of Morgan's bifurcated trial. Morgan argues that the trial court erroneously exercised its discretion when it denied her motion *in limine* to introduce expert testimony on post-traumatic stress disorder and expert and lay testimony on her psycho-social history during the guilt phase of her bifurcated trial. We conclude the trial court acted within its discretion in excluding such evidence.

*A. Psychiatric and Psychological Testimony Evidence in Bifurcated Trial.*

402

This case presents another attempt to expand the scope of 'mind science'[2] testimony within the framework of Wisconsin's "insanity plea" bifurcated trial system.[3] At the outset, we note that the use of psychiatric and psychological expert testimony in criminal trials has a volatile and contentious history in Wisconsin, particularly in the last twenty-five years. *See Haas v. Abrahamson,* 910 F.2d 384, 389-92 (7th Cir. 1990) (discussing recent appellate history of using psychiatric testimony in Wisconsin criminal trials); *see also infra* note 15 and accompanying text. Nevertheless, Wisconsin's bifurcated trial system dates back to the 1878 Revised Statutes that "provided for the trial of the plea of insanity prior to the determination of the general question of guilt." *Steele v. State,* 97 Wis. 2d 72, 85, 294 N.W.2d 2, 8 (1980) (citation omitted); *Muench v. Israel,* 715 F.2d 1124, 1131-32 (7th Cir. 1983) ("If the jury found the defendant to be sane beyond a reason-

---

[2] *See* RALPH ADAM FINE, FINE'S WISCONSIN EVIDENCE § 907.02 at 211-12 (Supp. Issue 6, 1994); *see also* DANIEL D. BLINKA, WISCONSIN EVIDENCE § 702.2 at 360 (Wisconsin Practice Series, Vol. 7, 1991) ("With regard to the introduction of expert testimony by psychologists and psychiatrists, the courts have taken an identifiably hard line against its use to assist juries. The cases evince a marked suspicion about the efficacy of the 'mind sciences' to enlighten lay juries about both substantive issues and questions of credibility.").

[3] The dissent contends that we placed this case in a "polemical mold." Dissent at 449. We firmly disagree. The logical extension of Morgan's arguments *would* "expand the scope of 'mind science' testimony within the framework of Wisconsin's 'insanity plea,' bifurcated trial system." Our resolution of this appeal clearly flows from the long-standing, albeit confusing, precedent established by our supreme court that confines the permissible use of such evidence.

able doubt, the guilt phase of the trial commenced, during which proof of insanity was inadmissible."), *cert. denied sub. nom, Worthing v. Israel,* 467 U.S. 1228 (1984).[4] While the present formulation under § 971.165, STATS.,[5] has little in common with its statutory forebearer, one of the underlying purposes of this

---

[4] While the first bifurcated trial system was enacted with the 1878 statutes, the bifurcation procedure was abandoned in 1911. *Muench v. Israel,* 715 F.2d 1124, 1132 (7th Cir. 1983), *cert. denied sub. nom, Worthing v. Israel,* 467 U.S. 1228 (1984). In 1970, the Wisconsin Legislature reintroduced the procedure and codified it in the statutes. *Id.* at 1132-33.

[5] Section 971.165, STATS. (1991-92), provides:

**971.165 Trial of actions upon plea of not guilty by reason of mental disease or defect. (1)** If a defendant couples a plea of not guilty with a plea of not guilty by reason of mental disease or defect:

(a) There shall be a separation of the issues with a sequential order of proof in a continuous trial. The plea of not guilty shall be determined first and the plea of not guilty by reason of mental disease or defect shall be determined second.

(b) If the plea of not guilty is tried to a jury, the jury shall be informed of the 2 pleas and that a verdict will be taken upon the plea of not guilty before the introduction of evidence on the plea of not guilty by reason of mental disease or defect. No verdict on the first plea may be valid or received unless agreed to by all jurors.

(c) If both pleas are tried to a jury, that jury shall be the same, except that:

1. If one or more jurors who participated in determining the first plea become unable to serve, the remaining jurors shall determine the 2nd plea.

2. If the jury is discharged prior to reaching a verdict on the 2nd plea, the defendant shall not solely on that account be entitled to a redetermination of the first plea and a different jury may be drawn to determine the 2nd plea only.

3. If an appellate court reverses a judgment as to the 2nd plea but not as to the first plea and remands for further proceedings, or if the trial court vacates the judgment as to the 2nd plea but not as to the first plea, the 2nd plea may be determined by a different jury drawn for this purpose.

system remains intact—"the separation of the issues" presented to the jury. Section 971.165(1)(a), STATS.
█

In the first or "guilt" phase of the bifurcated trial "[t]he determination of capacity to form an intent—to find whether or not the alleged offender[s] intended to do, in the sense of the criminal law, what [they] in fact did," is at issue. *Steele,* 97 Wis. 2d at 96, 294 N.W.2d at 13. In other words, for the purpose of this case, whether "the actor either ha[d] a purpose to do the thing or cause the result specified, or [wa]s aware that his or her conduct [wa]s practically certain to cause that result." Section 939.23(3) & (4), STATS. (defining criminal intent).

---

(d) If the defendant is found not guilty, the court shall enter a judgment of acquittal and discharge the defendant. If the defendant is found guilty, the court shall withhold entry of judgment pending determination of the 2nd plea.

(2) If the plea of not guilty by reason of mental disease or defect is tried to a jury, the court shall inform the jury that the effect of a verdict of not guilty by reason of mental disease or defect is that, in lieu of criminal sentence or probation, the defendant will be committed to the custody of the department of health and social services and will be placed in an appropriate institution unless the court determines that the defendant would not pose a danger to himself or herself or to others if released under conditions ordered by the court. No verdict on the plea of not guilty by reason of mental disease or defect may be valid or received unless agreed to by at least five-sixths of the jurors.

(3)(a) If a defendant is not found not guilty by reason of mental disease or defect, the court shall enter a judgment of conviction and shall either impose or withhold sentence under s. 972.13(2).

(b) If a defendant is found not guilty by reason of mental disease or defect, the court shall enter a judgment of not guilty by reason of mental disease or defect. The court shall thereupon proceed under s. 971.17. A judgment entered under this paragraph is interlocutory to the commitment order entered under s. 971.17 and reviewable upon appeal therefrom.

At issue in the second phase is "whether . . . there should be criminal *responsibility*" for those acts for which the defendant was found guilty. *Steele,* 97 Wis. 2d at 96, 294 N.W.2d at 13 (emphasis added).[6] "Whether . . . there should be criminal responsibility is essentially a moral issue. Is it just, in light of the ethics and standards of our society, to hold a person who is insane accountable for what has been done." *Id.* This requires a "gross evaluation that a person's conduct and mental state is so beyond the limits of accepted norms that to hold [the person] criminally responsible would be unjust." *Id.* In other words, the issue is whether " 'the defendant is *excused* from criminal responsibility.' "[7] *State v. Repp,* 122 Wis. 2d 246, 262,

---

[6] Section 971.15, STATS., provides:

**971.15 Mental responsibility of defendant. (1)** A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

(2) As used in this chapter, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial behavior.

(3) Mental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence.

[7] As recently stated in a different context by the Wisconsin Supreme Court:

[A] successful insanity acquittee [in Wisconsin] has been adjudged guilty beyond a reasonable doubt—whether by trial or stipulation—of engaging in criminal conduct, before he or she is entitled to a hearing on insanity. . . . A successful acquittee, although relieved of the criminal sanctions for his or her criminal conduct, is nonetheless guilty.

*State v. Randall,* 192 Wis. 2d 800, 833, 532 N.W.2d 94, 107 (1995).

362 N.W.2d 415, 422 (1985) (citation omitted). In contrast to other jurisdictions where "[t]he insanity defense . . . is predicated on the belief that an insane person is not able to intend an act . . . [i]n Wisconsin[,] a finding of insanity is not a finding of an inability to intend." *Id.* at 261, 362 N.W.2d at 421 (citations omitted).

This stark distinction between the two phases of a bifurcated trial controls the relevancy and admission of certain types of evidence proffered by the parties. *See Steele,* 97 Wis. 2d at 96, 294 N.W.2d at 13 (admission of evidence in phase one of bifurcated trial requires "fine tuning of an entirely different nature than that required for the admission of evidence on the general question of insanity"). As the supreme court stated in *State v. Leach,* 124 Wis. 2d 648, 370 N.W.2d 240 (1985):

> The principal purpose of bifurcation is to withhold from the jury, while it debates the question of guilt or innocence, evidence which is not legally relevant to that question. This permits the defendant to fully litigate the issue of mental responsibility without compromising his ability to contest the issue of guilt. Bifurcation protects both the defendant and the state from having to confront evidence which if introduced in the guilt phase, could confuse the jury or appeal to its prejudice or sympathy.

*Id.* at 662, 370 N.W.2d at 248 (citations omitted). The type of evidence that Wisconsin courts have been most leery of admitting in the guilt phase of the bifurcated trial is psychiatric or psychological expert testimony on the issue of intent to commit a crime. As strongly stated by the supreme court: " *While some courts may have blind faith in all phases of psychiatry, this court*

*does not." Steele,* 97 Wis. 2d at 97, 294 N.W.2d at 13 (emphasis added).[8]

*Steele v. State,* 97 Wis. 2d 72, 294 N.W.2d 2 (1980), provides the general guidelines of how such "mind science" expert testimony may be admissible in the guilt phase of a bifurcated trial. The primary issue raised in *Steele* was whether expert evidence on the "mental capacity to form an intent to kill [is] admissible in the guilt phase of a bifurcated trial for first degree murder." *Id.* at 76, 294 N.W.2d at 3. In *Steele,* the defendant was on trial for the murder of his wife. *Id.* at 74, 294 N.W.2d at 2. He alleged that he had a mental disease or defect that would "exonerate him of criminal responsibility." Thus, after the appropriate pleas, the defendant received a bifurcated trial. *Id.* His defense in the guilt phase of the trial was that "he did not intend to kill [his wife]." *Id.* at 77, 294 N.W.2d at 4. To that end, during the guilt phase, "the defense offered three expert witnesses who would have given an opinion about [the defendant's] . . . intent to kill." *Id.* at 80, 294 N.W.2d at 5.

The trial court ruled the expert evidence inadmissible in the guilt phase of the trial. *Id.* Upon conviction, the defense appealed the ruling. After tracing the extensive history surrounding the use of psychiatric testimony on the issue of intent, the supreme court determined that the trial court properly excluded the expert opinion evidence with respect to the defendant's mental capacity to form an intent to kill. *Id.* at 76, 294 N.W.2d at 3.

The court held that "the proffered evidence [was] neither competent, relevant, nor probative for the pur-

---

[8] *See supra* note 2 (discussing "suspicion" courts have with "mind science" testimony).

pose asserted." *Id.* at 97, 294 N.W.2d at 13. The court further stated:

> It should be made clear, however, that *we do not exclude from admission in the guilt phase of the trial ordinarily admissible evidence which tends to prove the state of mind of the defendant.* Previous statements to the extent that they are admissible, excited utterances, previous conduct, and express declarations bearing on intent or lack of it—whether the alleged crime was accidental, inadvertent, or mistaken—are all admissible. What we bar from introduction at the guilt phase of the trial is expert opinion testimony tending to prove or disprove the defendant's capacity to form the requisite criminal intent.

*Id.* at 97-98, 294 N.W.2d at 14 (emphasis added).

The supreme court later juxtaposed the framework of the *Steele* holding, in which the bifurcated trial structure was at issue, on top of a single phase homicide trial. In *State v. Flattum*, 122 Wis. 2d 282, 361 N.W.2d 705 (1985), the defendant was on trial for the murder of an elderly woman. *Id.* at 285, 361 N.W.2d at 707. The defendant did not allege that he had a mental disease or defect and, therefore, the bifurcated trial system was not implemented. *Id.* at 284, 361 N.W.2d at 707. The defendant did argue, however, that he did not have the "capacity to form the specific intent to commit the crime" because he was severely intoxicated. *Id.* at 285, 361 N.W.2d at 707. Consequently, the defense sought to introduce the expert testimony of a psychiatrist "to prove that the defendant's voluntary intoxication rendered him unable to form the specific intent to commit first-degree murder." *Id.* After an offer of proof, the trial court ruled the expert opinion testimony inadmissible. *Id.* at 286, 361 N.W.2d at 708.

The supreme court held that "a psychiatrist may not give his or her opinion on the issue of capacity to form intent if that opinion rests in whole or in part on the defendant's mental health history." *Id.* at 288-89, 361 N.W.2d at 709. In reaching its conclusion, the court invoked its decision in *Steele*, stating:

> In *Steele*, this court concluded that psychiatric opinion testimony which tends to prove or disprove intent is "neither competent, relevant, nor probative . . . ." The *Steele* decision was a narrow one: it barred psychiatric opinion testimony on the issue of capacity to form intent if that opinion is based on a defendant's mental health history.

*Id.* at 289, 361 N.W.2d at 709 (citation omitted). The court further noted:

> *Steele* does not render inadmissible *all* expert opinion evidence from a psychiatrist on the issue of a defendant's capacity to form intent. We reemphasize that the *Steele* decision was predicated on this court's disbelief in the ability of psychiatry to causally link psychiatric disorders to a lack of capacity to form specific intent.[9]

*Id.* at 297, 361 N.W.2d at 713.

With respect to the admission of lay and expert evidence of the defendant's mental health history, the court stated:

---

[9] The court did hold, however:

[T]hat a psychiatrist, properly qualified as an expert on the effects of intoxicants, may render an expert opinion as to whether a defendant's voluntary intoxicated condition negatived the defendant's capacity to form the requisite intent, but only if that opinion is based solely on the defendant's voluntary intoxicated condition.

*State v. Flattum,* 122 Wis. 2d 282, 297, 361 N.W.2d 705, 713 (1985).

> While the admissibility of this psychiatric history
> was not an issue in the *Steele* case, we find, as the
> *Steele* court implicitly did, that either psychiatric
> testimony or lay testimony detailing the psychiatric
> and personal history of the defendant may be
> admitted, *if relevant*, to cast doubt upon or to prove
> the defendant's intent to commit the crime charged.
> What we prohibited in *Steele* was utilizing that tes-
> timony as a basis for eliciting psychiatric opinion
> testimony on the issue of capacity to form intent.

*Id.* at 303, 361 N.W.2d at 716 (emphasis added).
Accordingly, the court determined:

> We find that properly qualified psychiatric tes-
> timony with respect to a defendant's mental health
> history is admissible *if such testimony is shown to be
> relevant.* We find, despite our concern about diag-
> nostic reliability, that this category of evidence is
> not per se infirm due to unreliability. *The party
> proffering psychiatric testimony of this type must
> demonstrate the legal significance of the clinical
> facts sought to be introduced*[.] We hasten to point
> out, however, that a psychiatrist is not permitted to
> testify as to the effect of a defendant's psychiatric
> condition on his or her capacity to form the requisite
> intent. As pointed out earlier in this opinion, such
> testimony is neither competent, relevant, nor pro-
> bative. This is true whether such opinion testimony
> is offered with respect to a particular defendant or
> in response to hypothetical questions.

*Id.* at 305, 361 N.W.2d at 717 (citation omitted; empha-
sis added).

The court also reiterated that "[t]rial courts are
free to exclude such testimony, pursuant to [RULE]
904.02, Stats., if they find that the testimony is not
relevant." *Id.* at 306, 361 N.W.2d at 717; *see* RULE

411

904.02, STATS.[10] Further, even if the testimony were relevant, trial courts could exclude it "if they find that the evidence's probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Flattum,* 122 Wis. 2d at 306, 361 N.W.2d at 717; *see* RULE 904.03, STATS.[11] Finally, the supreme court concluded that the trial court could exclude psychiatric testimony if it was "not based on scientific knowledge, and that therefore the witness'[s] conclusion [was] based on the same factors which the jury [would be] free to use in reaching its conclusion." *Flattum,* 122 Wis. 2d at 306, 361 N.W.2d at 717-18; *see* RULE 907.02, STATS.[12]

---

[10] RULE 904.02, STATS., provides:

**Relevant evidence generally admissible; irrelevant evidence inadmissible.** All relevant evidence is admissible, except as otherwise provided by the constitutions of the United States and the state of Wisconsin, by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible.

[11] RULE 904.03, STATS., provides:

**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[12] RULE 907.02, STATS., provides:

**Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

It is the juxtaposition of the holdings of *Steele* and *Flattum* on which Morgan bases a great portion of her appeal. Morgan argues that the trial court erred in excluding expert testimony on post-traumatic stress disorder and expert and lay testimony on her psycho-social history from the guilt phase of her trial. Accordingly, we next address the issues emanating from the trial court's denial of Morgan's motion *in limine*.

## B. *Guilt-Phase Motion* In Limine.

In her motion *in limine*, Morgan sought to introduce expert and lay testimony in support of the defense theory that she suffered from post-traumatic stress disorder at the time of Brenda Adams's killing, "which caused [her] to unintentionally act" at the time of the shooting. Specifically, she sought to introduce a wide array of expert testimony "demonstrat[ing] that [she] suffer[ed] from Post-traumatic Stress Disorder . . . and explain[ing] how that disorder affected [her] on the night of October 26, 1991." She argued that "[e]xpert testimony on [post-traumatic stress disorder] and its related symptoms is necessary because the disorder is outside the common understanding of the jury." Further, she argued that:

> Evidence of Felicia's past experiences with violence [was] relevant to demonstrate the existence of the PTSD which caused [her] to unintentionally act on October 26, 1991. Expert testimony as to the effects of those violent experiences on [her] conduct [was] also essential to assist the jury's understanding of how her perceptions have been shaped by the years of violence that she has endured[,] and not just by the events surrounding the night of the homicide. Again, the cumulative effect of the violence . . .

413

caused the post-traumatic stress reaction evidence[d] on the night of the homicide.

She then listed seventeen examples of "violent events experienced by [her] in her home or neighborhood" that "caused the onset of PTSD." *See infra* op. at 429–30. These events would be introduced through the lay testimony of friends and family. Enveloped within this historical evidence would have been expert and lay testimony on allegedly frequent hallucinations, disassociations, and perceptions by Morgan that the experts would have argued supported their diagnoses of post-traumatic stress disorder and brief reactive psychosis.

After reviewing the trial briefs presented by the parties and engaging in a lengthy hearing on the motion *in limine*, the trial court denied Morgan's motion and excluded all of the proffered evidence from the guilt phase of her bifurcated trial. The trial court noted the supreme court decisions in *Steele* and *Flattum*, stating that before the expert and lay testimony could be admitted into evidence during the "guilt" phase, it had to be relevant to an issue before the jury. The court recognized that the separation of the issues between the two phases of the bifurcated trial guides the admission of any proffered psychiatric, psychological, or mental health history evidence. Further, the trial court stated that, during the guilt phase of the trial, the burden is on the State to prove each and every element of the crime charged while "[t]he defense need not put [on] any defense under [the law]." But, the trial court cautioned:

> [I]f they decide to put in a defense, or [if] through cross-examination of the State's witnesses [they] put in facts or inferences of a defense, it normally

has to be . . . what is a recognizable defense and allowable defense under our law; [a]nd our law, of course, is evolving and it's changing.

. . . .

But we will be very careful in recognizing defenses because it is too easy to conjure up after the fact[,] imaginative and otherwise excuses and reasons for doing what a person has done.

We will recognize certain limited parameters, self-defense, defense of others, provocation and manslaughter, lesser[-]included [offenses], intoxication, . . . coercion, things of that type. We will say, yes, we can understand that those things can happen. And we will recognize those. We will also in the right occasion look at other possible mitigating situations as to the issue of intent. But we'll look at those very carefully.

. . . We will look at certain things in mitigation, but we will do that in a very careful way. We will make sure that it meets the issue of relevancy and trustworthiness. So every time someone comes up with a theory of defense that they wish the courts to use to mitigate or to lessen their client's . . . responsibility, we will look at it very carefully because of the issue of relevance.

The trial court then concluded that the evidence raised in Morgan's motion *in limine* was not relevant in the guilt phase of the trial, nor was it "tied into any particular defense." Significantly, while the court excluded the evidence and testimony from the guilt phase of the trial, the court stated that it would be admissible during the possible second phase of the trial—when the issue would be whether society would hold Morgan criminally responsible for her actions.

415

## 1. Analysis and Application.

■■■

A trial court possesses great discretion in determining whether to admit or exclude evidence. *State v. Evans,* 187 Wis. 2d 66, 77, 522 N.W.2d 554, 557 (Ct. App. 1994). We will reverse such a determination only if the trial court erroneously exercises its discretion. *Id.* "A proper exercise of discretion consists of the court applying the relevant law to the applicable facts in order to reach a reasonable conclusion." *State v. Jackson,* 188 Wis. 2d 187, 194, 525 N.W.2d 739, 742 (Ct. App. 1994).

After evaluating the record, the trial court's decision, and the relevant law, we conclude that the trial court acted within its discretion when it excluded the proffered evidence from the guilt phase of Morgan's trial. In reaching our conclusion, we concur with the decision of the trial court that the proffered evidence in Morgan's motion *in limine* was not relevant in the guilt phase of her bifurcated trial to any issue or to any recognized privilege or defense to criminal conduct, but was more appropriately relegated to the second phase of the trial on the issue of Morgan's criminal responsibility for her actions.

### a. Expert Testimony

■■■

We first address Morgan's contention that the trial court improperly excluded expert testimony on post-traumatic stress disorder. "Expert testimony is admissible only if it is relevant." *State v. Pittman,* 174 Wis. 2d 255, 267, 496 N.W.2d 74, 79, *cert. denied,* 114 S. Ct. 137 (1993). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be without the evidence." RULE 904.01, STATS. A trial court's determination on the relevancy of the proffered evidence is a discretionary decision. *Pittman,* 174 Wis. 2d at 267, 496 N.W.2d at 79. In addition, relevant expert evidence must also "assist the trier of fact to understand the evidence or determine a fact in issue." RULE 907.02, STATS.; *Pittman,* 174 Wis. 2d at 267, 496 N.W.2d at 79. A trial court's determination on whether the evidence will assist the trier of fact is also a discretionary determination. *Id.* at 268, 496 N.W.2d at 79. We need not review a trial court's determination of whether the expert testimony would assist the jury, if we conclude that such evidence was irrelevant to an issue confronting the jury.

In her motion *in limine,* Morgan argued that testimony on post-traumatic stress disorder was relevant to show that at the time of the homicide she acted "unintentionally." It was the defense theory that the cumulative effects of a lifetime of violence to which Morgan was allegedly exposed caused Morgan to suffer from post-traumatic stress disorder, which in turn caused her to act "unintentionally" in the homicide of Brenda Adams.[13] Thus, Morgan argues that expert testimony on post-traumatic stress disorder was

---

[13] While she does not use the phrase in her appellate brief, Morgan's counsel has elsewhere used the phrase "urban psychosis" to describe her criminal defense theory for Morgan's actions in Adams's homicide. *See generally* Julie G. Shoop, *Criminal Lawyers Develop "Urban Psychosis" Defense,* TRIAL, Aug. 1993, at 12, 12-13. We reach no conclusions on the psychiatric accuracy or clinical reliability of such a term, but note that we are unable to locate any academic or judicial support for, or recognition of, such an "urban psychosis" defense. Accordingly, this

necessary to explain Morgan's behavior during the fifteen-minute crime spree, because "the disorder [was] outside the common understanding of the jury."

We disagree that expert testimony on post-traumatic stress disorder was relevant during the guilt phase of Morgan's trial. As recognized by the trial court, for expert evidence to be admissible it must be relevant to an issue before the fact-finder. The trial court was fully within its wide discretion to conclude that the proffered expert testimony on post-traumatic stress disorder was irrelevant to any issue raised in the guilt phase of the trial. We agree with the trial court that the only way Morgan's allegation that she suffered from post-traumatic disorder would be relevant in the guilt phase of the trial was if it either had any tendency to make one of the elements of the offenses charged more or less probable, or if it was relevant to a recognized privilege or defense to that crime.

Morgan argues that the post-traumatic stress disorder evidence was relevant to the intent element of the homicide charge; that is, whether she had formed the necessary specific intent to kill. Morgan argues that she did not have the specific intent to kill necessary for first-degree homicide, but rather that her actions were reckless.[14] In making this argument,

court will not be the first to give such recognition to an unfounded legal concept.

[14] Thus, Morgan's defense is likened to that raised by the defendant in *State v. Klimas,* 94 Wis. 2d 288, 288 N.W.2d 157 (Ct. App. 1979), *cert. denied,* 449 U.S. 1016 (1980), *overruled on other grounds by, State v. Escalona-Naranjo,* 185 Wis. 2d 168, 517 N.W.2d 157 (1994), in which we concluded that evidence of the defendant's "extreme state of depression was clearly relevant to disprove the specific intent element of first-degree

Morgan misconstrues Wisconsin's unique law on the use of "mind science" testimony on the issue of specific intent to commit a crime.[15] The supreme court long ago

murder." *Id.* at 297, 288 N.W.2d at 162. Our conclusion on this issue in *Klimas* was mandated by cases that were subsequently overruled by *Steele v. State,* 97 Wis. 2d 72, 85, 294 N.W.2d 2, 3 (1980). Accordingly, we conclude our determination of the relevancy of such evidence in *Klimas* is no longer controlling. *See infra* note 15 and accompanying text.

[15] Any confusion is understandable when one considers the contorted trail of precedents on this issue in Wisconsin. We are convinced that only a judge or attorney armed with Theseus' "clew of thread" could find his or her way through this labyrinth of confusing precedents and dead-end opinions unscathed. *See e.g.,* THOMAS BULFINCH, THE AGE OF FABLE OR BEAUTIES OF MYTHOLOGY 189-90 (Mentor ed., 1962) (1855) (In Greek mythology the hero Theseus entered the maze of the Minotaur, slew the monster, and safely escaped the labyrinth by using a "clew of thread" given to him by King Minos's daughter, Ariadne.).

In a long line of cases issued by the Wisconsin Supreme Court in the late 1960s and early 1970s, psychiatric testimony on the issue of intent was excluded in the first phase of bifurcated criminal trials. *See Sprague v. State,* 52 Wis. 2d 89, 94-98, 187 N.W.2d 784, 786-88 (1971); *State v. Anderson,* 51 Wis. 2d 557, 563-64, 187 N.W.2d 335, 339 (1971); *State v. Hebard,* 50 Wis. 2d 408, 413-25, 184 N.W.2d 156, 159-65 (1971); *Curl v. State,* 40 Wis. 2d 474, 484-86, 162 N.W.2d 77, 82-83 (1968), *cert. denied,* 394 U.S. 1004 (1969); *State ex rel. La Follette v. Raskin,* 34 Wis. 2d 607, 611-28, 150 N.W.2d 318, 321-29 (1967).

In 1978, the Seventh Circuit Federal Court of Appeals, in a case arising out of a *habeas* petition, concluded that Wisconsin's exclusion of such testimony violated a defendant's due process rights to present relevant evidence. *Hughes v. Mathews,* 576 F.2d 1250, 1259 (7th Cir.), *cert. dismissed sub. nom, Israel v. Hughes,* 439 U.S. 801 (1978). Consequently, in that same year, the Wisconsin Supreme Court, based upon the Seventh Circuit's decision in *Hughes,* overruled its prior decisions on this issue

rejected " ' the suggestion that the personality dysfunction or dyscontrol, short of psychosis or insanity, is a relevant factor in the determination of guilt.' " *State v. Hebard,* 50 Wis. 2d 408, 420, 184 N.W.2d 156, 163 (1971) (quoting *Curl v. State,* 40 Wis. 2d 474, 485, 162 N.W.2d 77, 83 (1968), *cert. denied,* 394 U.S. 1004 (1969)). Further, "[p]ersonality disturbances or emotional disorders that fall short of insanity are not required areas of court inquiry and particularly not in that portion of [the] bifurcated trial on the issue of guilt." *Curl,* 40 Wis. 2d at 486, 162 N.W.2d at 83. The Wisconsin courts reached this conclusion, in part, because " ' "it is not at all apparent that psychiatrists know any more than does the layman about whether the defendant had an intent to kill when the act causing death was committed." ' " *Steele,* 97 Wis. 2d at 95, 294 N.W.2d at 12 (citation omitted). Further, while "much has been written on the role of emotions in patterns of human behavior and in the causation of crime. . . . at best a courtroom makes an awkward psychiatrist's couch." *Curl,* 40 Wis. 2d at 485, 162 N.W.2d at 83.

and concluded that due process "requires the admission of competent psychiatric testimony during the guilt-phase of a bifurcated trial relevant to the defendant's state of mind at the time of the crime." *Schimmel v. State,* 84 Wis. 2d 287, 302, 267 N.W.2d 271, 278 (1978).

Two years later, however, the supreme court in *Steele* did an about-face and overruled *Schimmel. Steele,* 97 Wis. 2d at 85, 294 N.W.2d at 7-8. The court also expressly reinstated its holdings in the cases overruled by *Schimmel. Id.* Accordingly, the holdings of *Sprague, Anderson, Hebard, Curl,* and *La Follette* on the issue of "mind science" testimony in bifurcated trials are binding upon this court, and we reinvoke their analysis in reaching our conclusions in the case at bar.

██

Nonetheless, there may be situations in which a personality "dysfunction or disorder" impacts a defendant's state of mind. In some cases "mind science" testimony on the defendant's state of mind may be admitted into evidence in phase one of a bifurcated trial. *Steele,* 97 Wis. 2d at 97-98, 294 N.W.2d at 14. Judge Richard Posner, writing for the Seventh Circuit Court of Appeals, succinctly distinguished situations in which psychiatric evidence on the defendant's state of mind is relevant to the issue of specific intent, from situations in which such evidence is irrelevant in the guilt phase of Wisconsin's bifurcated trial system:

> Suppose that [the defendant] had been so deranged at the time of the killing that he thought [the victim was] not a human being but a toad, or that he thought [the victim was] a convicted murderer and [that he was] the public executioner, appointed to execute [the victim] on the spot. In neither case would [the defendant] have harbored the intent required to convict one of first-degree murder, so the trier of fact would have had to acquit him of that charge without reaching the issue of insanity.

*Morgan v. Israel,* 735 F.2d 1033, 1035 (1984) (but noting that the defendant would likely be found guilty of a lesser-included offense in such situations), *cert. denied,* 469 U.S. 1162 (1985). In such situations, psychiatric or psychological "state of mind" testimony could be very relevant to the issue of specific intent to commit the offense charged. In contrast, however:

> Now suppose, instead, that [the defendant], though realizing that [the victim] was a human being whom he was not licensed to kill—knowing, in other words, that he was committing mur-

der—murdered [the victim] because he heard voices inside his head commanding him to do so and could not resist their importunings, or because he had a paranoid delusion that [the victim] was plotting against him or was a tool of Satan or had the evil eye, or for any other reason, rooted in insanity, which overbore [the defendant's] will to resist committing a criminal act. *In all of these cases [the defendant] would intend to do a killing he knew to be without authorization in law, and thus would have the required intent for first-degree murder*, but he would have a plausible insanity defense.

*Id.* at 1035-36 (emphasis added).

The situation presented in the case at bar is analogous to the latter example posed in Judge Posner's scheme. Morgan argues that the post-traumatic stress disorder she was experiencing at the time of Adams's homicide caused her to re-experience past traumatic events "in such a way as to cause [her] to experience a dissociative state or flashback." Thus, according to Morgan's offer of proof she was not arguing that in her dissociative state she believed she (in Judge Posner's words) was "authorized" to kill Adams or that Adams was not a human being, or any other such analogous situation, but rather that she was re-experiencing a violent episode from her past and reacted accordingly. Any psychiatric "state of mind" testimony supporting this argument was irrelevant in the guilt phase of her trial because it would have no tendency to make the existence of her *specific* intent to kill Adams any more or less probable. *See* RULE 904.01, STATS. Morgan has not shown how she did not "intend to do a killing [s]he knew to be without authorization in law, and thus [she had] the required intent for first-degree murder." *Morgan,* 735 F.2d at 1036. The alleged fact that Morgan was in a dissociative state does not carry with it the

automatic supposition that while in the dissociative state she did not have the specific intent to kill Adams.[16] Accordingly, such evidence is irrelevant in

[16] In her motion *in limine*, Morgan states:

> The events of the night in question[ ], October 26, 1991, are alleged to have occurred within an approximate time-frame of fifteen minutes, and it is the theory of the defense that the events within those fifteen minutes resonate the traumatic events experienced by Felicia Morgan as recent as two weeks prior to the episode and as remote as when the defendant was four years old. Felicia Morgan will testify that on the night of the murder, she began to experience feelings of dissociation at the time of the second set of robbery attempts. Felicia Morgan and experts who have interviewed Felicia Morgan will testify that she believed that one robbery victim, Mercedes C[.], was a "girl" who had brandished a gun while robbing Felicia Morgan of her coat several months earlier, and that Morgan re-experienced that event as a flashback, (a dissociative state), *which prohibited her from forming the specific intent* to rob Mercedes C[.]. Felicia Morgan will also testify that her feeling of dissociation continued and intensified at the time of the robbery of Brenda Adams when bystanders fired gunshots in Felicia Morgan's direction at the scene. Felicia Morgan will testify that at the time she heard the first gunshots, she felt as if she were in a "trance-like" state.

(Emphasis added.) As we read this statement, Morgan is intimating that her dissociative state "*prohibited her from forming the specific intent*" necessary to commit the charged offense. Use of her proffered expert testimony to support such a contention crosses the line into that which *Steele* clearly forbids: using expert testimony "tending to prove or disprove *the defendant's capacity to form the requisite criminal intent*." *Steele,* 97 Wis. 2d at 98, 294 N.W.2d at 14.

While Morgan backs away from this proposition in her offer of proof before the trial court and in her appellate brief, we note the inherent danger of using psychiatric testimony on the issue of intent. While a defendant may only intend to use such psychiatric evidence for permissible ends, the testimony often blurs into forbidden discussions on capacity to form intent. Thus, the "exclusion of psychiatric evidence from the guilt phase of bifur-

the guilt phase of a bifurcated trial, but more appropriate to the question of whether, because of the existence of post-traumatic stress disorder, Morgan should be held criminally responsible for her actions.

Additionally, Morgan has not shown how evidence of post-traumatic stress disorder in this case is relevant to any legislatively recognized privilege or defense in the guilt phase of her trial. While Morgan argues that Wisconsin courts have recognized criminal defenses based on syndromes related to or derived from post-traumatic stress disorder, the recognition of such defenses and the subsequent admissibility of expert testimony on the syndromes is not as clearly established as Morgan would lead us to believe. Further, the accepted use of such syndrome evidence in the cases cited by Morgan is clearly distinguishable from the issues in the case at bar.

Wisconsin courts have recognized the admissibility of battered woman's syndrome evidence in limited situations. *See State v. Richardson,* 189 Wis. 2d 418, 426, 525 N.W.2d 378, 382 (Ct. App. 1994) (expert testimony comparing defendant in homicide trial with profile of battered woman is admissible as long as it does not include expert's conclusion about defendant's actual beliefs at time of offense, reasonableness of those beliefs, or defendant's state of mind before, during and after criminal act); *State v. Bednarz,* 179 Wis. 2d 460, 465-67, 507 N.W.2d 168, 171-72 (Ct. App. 1993) (expert testimony on battered woman's syndrome admissible to explain victim's recantation in domestic abuse case); *cf. State v. Felton,* 110 Wis. 2d 485, 509-10,

---

cated trials [is] a 'pragmatic recognition of the limits of jury tolerance for distinguishing angels on the heads of pins.' " *Id.* at 89, 294 N.W.2d at 9 (citation omitted).

329 N.W.2d 161, 172 (1983) (trial counsel ineffective for failing to investigate whether battered woman's syndrome evidence would implicate heat-of-passion manslaughter defense). These cases, however, are easily distinguished from the case at bar because the evidence was either relevant to a recognized privilege to criminal conduct: self-defense (§ 939.48, STATS.) (*see Richardson,* 189 Wis. 2d at 423, 525 N.W.2d at 380; *Felton,* 110 Wis. 2d at 505, 329 N.W.2d at 170); adequate provocation (or heat-of-passion manslaughter) (§ 939.44, STATS.) (*see Felton,* 110 Wis. 2d at 508-09, 329 N.W.2d at 171-72); or relevant to explain a victim's recantation of allegations. *See Bednarz,* 179 Wis. 2d at 465-67, 507 N.W.2d at 171-72. Morgan does not implicate one of the above privileges in support of her defense to Adams's homicide.

Morgan also argues that Wisconsin courts have declared expert testimony on the so-called Vietnam veteran's syndrome relevant in criminal cases. Such evidence has only been recognized in limited situations, which also are distinguishable from the present case. In *State v. Coogan,* 154 Wis. 2d 387, 391-92, 453 N.W.2d 186, 187 (Ct. App. 1990), a defendant convicted of a double homicide sought a new trial partly based on the alleged discovery, through hypnosis and prison psychotherapy, "that at the time of the killings he was having flashbacks and believed he was in a combat situation in Vietnam." Thus, he sought "to present expert testimony diagnosing his condition as post-traumatic stress disorder (PTSD) and lay testimony describing his behavior conforming to that diagnosis." *Id.* at 392, 453 N.W.2d at 187.

Although we disposed of the defendant's appeal on other grounds, we stated our belief that expert testimony on the defendant's post-traumatic stress disorder

425

diagnosis was admissible. *Id.* at 401, 453 N.W.2d at 191. Our determination in *Coogan* is not, however, contradictory to our conclusion with respect to the relevancy of Morgan's proffered evidence in the principle case.

In *Coogan*, we stated that the defendant "related a version of events that, if believed, demonstrated he was suffering a dissociative flashback episode to his Vietnam experience at the time of the killings. He perceived himself as searching a suspected enemy hut in Vietnam looking for Viet Cong guerrillas or documents, rather than robbing the tavern." *Id.* at 394, 453 N.W.2d at 188. The relevancy of such state of mind evidence on the issue of specific intent is clearly more analogous to Judge Posner's example of defendants suffering from a dissociative state who believe they are authorized to kill another person. *Morgan,* 735 F.2d at 1035. Thus, unlike the present case, in *Coogan* the defendant raised sufficient grounds to question whether in his state of mind he harbored the specific intent to commit the two homicides. Accordingly, we stated our belief that expert testimony on the diagnosis could be admissible in the guilt phase of a bifurcated trial. *See Coogan,* 155 Wis. 2d at 401, 453 N.W.2d at 191. This is clearly not analogous to the principle case. Morgan has not shown how in her alleged dissociative state of mind she did not harbor the specific intent to kill Adams.

Significantly, a distinction exists between: (1) using post-traumatic stress disorder state-of-mind evidence to specifically cast doubt on the existence of the necessary specific intent of a charged offense, as in the case of *Coogan,* or to support a recognized privilege to that offense, as in the case of *Richardson*; and (2) using

a diagnosis of post-traumatic stress disorder, in a general sense, *as* the defense. Wisconsin law has never recognized the mere diagnosis of post-traumatic stress disorder as a "blanket" defense in the guilt phase of a bifurcated trial. If used in such a broad manner it becomes nothing more than an "insanity" defense, in which the diagnosis only becomes relevant in the second phase of the trial—after the defendant has been adjudged guilty of committing the crime.

Our review of Morgan's motion *in limine*, offer of proof to the trial court, and appellate brief does not support her conclusion that her alleged post-traumatic stress disorder was necessarily relevant to any specific issue in the guilt phase of her trial.[17] In sum, we conclude the trial court properly exercised its discretion

---

[17] The dissent blurs our distinction on the use of "mind science" testimony on "battered woman's syndrome" and the proffered evidence in this case. *See* dissent at 451–52. In both *State v. Richardson,* 189 Wis. 2d 418, 525 N.W.2d 378 (Ct. App. 1994), and *State v. Felton,* 110 Wis. 2d 485, 329 N.W.2d 161 (1983), the defendants were attempting to use the evidence to support a recognized privilege or affirmative defense to their criminal conduct. In *Richardson,* the defendant would have used the evidence to support her contention that at the time she committed the crime she was acting in self-defense. In *Felton,* the defendant argued that the evidence was admissible to show that she had adequate provocation.

Morgan is not arguing that she was acting in self-defense, or that she had adequate provocation when she shot and killed Brenda Adams. Instead she is presenting a "lesser-included-offense" defense, that is, that she should be acquitted of first-degree intentional homicide, and convicted of first-degree reckless homicide, because she was suffering from post-traumatic stress disorder at the time she fired the gun. Her proffered use of the "diagnosis [of PTSD] with its actual *causation* of her

when it excluded expert testimony on Morgan's alleged post-traumatic stress disorder from the guilt phase of her bifurcated trial. The mere proffered diagnosis that Morgan suffered from post-traumatic stress disorder on the night of the homicide does not automatically establish the admissibility of such evidence in the guilt phase of a bifurcated trial. Such evidence must still withstand the trial court's rigorous application of the rules of evidence—particularly the test of relevancy—before the evidence is allowed before the jury. We agree with the trial court that Morgan failed to establish the relevancy of the expert testimony to an element at issue or to any recognized privilege raised during the first phase of her trial.[18]

### b. Psycho-Social History Evidence.

We next address Morgan's contention that the trial court erred in excluding from the guilt phase of her trial the expert and lay testimony on Morgan's psycho-social history. In her motion *in limine*, Morgan sought

---

actions," dissent at 453, is forbidden by *Curl, Hebard*, and their progeny.

[18] Because we agree with the conclusion of the trial court—that the proffered expert evidence was not relevant—we need not pursue our analysis any further. We do note, however, that even if a defendant can demonstrate the legal significance of such "mind science" evidence, it is not necessarily admissible. The trial court may still exclude the testimony if "the evidence's probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See Flattum*, 122 Wis. 2d at 306, 361 N.W.2d at 717; *see also* RULE 904.03, STATS. We believe that Morgan would be hard-pressed to show that her proffered evidence would overcome this balancing test.

the introduction of the following evidence through the testimony of friends and family:

1. testimony that Oliver shot his gun at a liquor bottle in a drug house when Morgan was present, three days before the shootings, and that Morgan was terrified;

2. testimony that two weeks before the shooting, a man pulled a gun on Morgan, her mother, and a friend, and that Morgan stepped into the path of the gun before her mother intervened;

3. testimony that gang members shot at Oliver while in Morgan's presence three weeks before the homicide;

4. testimony that Morgan was robbed by a group of girls one month before the shooting;

5. testimony that Morgan's sister's boyfriend, a father-figure to Morgan, was shot and paralyzed in January 1991;

6. testimony that Morgan was robbed of her coat at gunpoint, in December 1990;

7. testimony that Morgan's cousin was killed in a drive-by shooting in October 1990;

8. testimony that Morgan's uncle, a close friend, was shot and killed in September 1990;

9. testimony that Morgan was robbed of her jewelry at gunpoint in September 1989;

10. testimony by Morgan that she was tied up and raped by the son of a landlord in 1988, when she was fourteen years old;

11. testimony that Morgan's cousin was shot in a 1988 street fight and subsequently lost the use of her arm;

12. testimony that in 1988 Morgan stepped in front of a man with a gun to protect her aunt;

13. testimony that Morgan was severely beaten and robbed by a group of girls in June 1987;

14. testimony that Morgan's mother shot a man, in front of Morgan, because he was molesting Morgan while giving her a bath;

15. testimony that Morgan was regularly beaten by her mother and father;

16. testimony that when Morgan was three years old, her father shot at her mother "because there was too much salt in the gravy";

17. testimony that Morgan, from age four to six years old, witnessed her mother and father "regularly dine with loaded revolvers at their sides during family dinners so that neither one would be unprotected from the violent outbursts of the other."

Morgan then wanted to present expert psychiatric and psychological testimony as to the effects of these violent experiences on Morgan's conduct the night of the homicide. She argues on appeal that the expert and lay testimony she wished to present was nothing more than admissible mental health history under *Flattum*. We disagree.

As stated in *Flattum*, "either psychiatric testimony or lay testimony detailing the psychiatric and personal history of the defendant may be admitted, *if relevant*, to cast doubt upon or to prove the defendant's intent to commit the crime charged." *Flattum*, 122 Wis. 2d at 303, 361 N.W.2d at 716 (emphasis added). Further, "[t]he party proffering psychiatric testimony of this type must demonstrate the legal significance of the

clinical facts sought to be introduced." *Id.* at 305, 361 N.W.2d at 717. "Trial courts are free to exclude such testimony, pursuant to [RULE] 904.02, Stats., if they find that the testimony is not relevant." *Id.* at 306, 361 N.W.2d at 717.

As we resolved above, the issue of whether Morgan suffered from post-traumatic stress disorder at the time of the homicide was not relevant in the guilt phase of her trial. Nor do we conclude that Morgan has demonstrated any other "legal significance" of the psycho-social history evidence to the guilt phase[19] of her trial. *Id.* at 305, 361 N.W.2d at 717. While we acknowledge that the proffered testimony, if accurate, portrays a horrific life fraught with ceaseless violence and senseless bloodshed—a life that we would earnestly hope no person should have to endure—we are unable to attach or locate any legal significance of this testimony to the issue of Felicia Morgan's guilt or innocence in Brenda Adams's homicide. Tragedy does not beget legal relevance.

Further, many of the events "are earlier episodes in the life of the defendant, remote in time, that cannot be given continuing significance on the issue of the defendant's intent . . . on the date of the offense." *Curl,* 40 Wis. 2d at 484, 162 N.W.2d at 82. Consequently, the trial court properly exercised its discretion in excluding

---

[19] Such testimony might, under *Flattum,* be appropriate and potentially admissible in the responsibility phase of a bifurcated trial (if relevant and tied to an expert's testimony of a defendant's diagnosed mental disease or defect) where the jury must determine whether, in light of an alleged mental disease or defect, the defendant should be held criminally responsible for her actions.

the psycho-social history from this phase of Morgan's trial.

## 2. Constitutional Right to Present Defense

Morgan also contends that the trial court's exclusion of testimony regarding post-traumatic stress disorder violated her constitutional right to present a defense. Morgan's contention has no merit.

Whether a defendant's right to present a defense was violated is a question of "constitutional fact" that we review *de novo. State v. Heft,* 185 Wis. 2d 288, 296, 517 N.W.2d 494, 498 (1994). "The due process rights of a criminal defendant are 'in essence, the right to a fair opportunity to defend against the State's accusations.'" *Evans,* 187 Wis. 2d at 82, 522 N.W.2d at 560 (citation omitted). The right to present evidence, however, "is rooted in the Confrontation and Compulsory Process Clauses of the United States and Wisconsin Constitutions." *Id.* at 82-83, 522 N.W.2d at 560. While the rights granted by the Confrontation and Compulsory Process Clauses are fundamental and essential to achieving the constitutional objective of a fair trial, *see Chambers v. Mississippi,* 410 U.S. 284, 294-95 (1973), there is no constitutional right to present irrelevant evidence. *Jackson,* 188 Wis. 2d at 196, 525 N.W.2d at 743. We already determined that the trial court properly concluded that evidence of post-traumatic stress disorder was irrelevant to any issue in the guilt phase of Morgan's trial. Therefore, Morgan had no constitutional right to present this irrelevant evidence. *Id.; cf. Haase,* 910 F.2d at 398 (holding Wisconsin rule excluding psychiatric evidence on capacity to form intent does not offend due process); *Muench,* 715 F.2d at 1144-45 (holding Wisconsin "is not *constitutionally compelled*

to recognize doctrine of diminished capacity and hence [the] state may exclude expert testimony offered for the purpose of establishing that a criminal defendant lacked the capacity to form a specific intent").

## III. LESSER-INCLUDED OFFENSE JURY INSTRUCTION

Morgan next argues that the trial court erred when it denied her request for a lesser-included offense jury instruction for first-degree reckless homicide at the close of the evidence during the first phase of her trial. We disagree.

At the jury-instruction conference, Morgan requested lesser-included offense instructions for both felony murder, *see* § 940.03, STATS.,[20] and first-degree reckless homicide, *see* § 940.02(1), STATS.[21] The trial court determined that even by viewing the evidence in a light most favorable to Morgan, a jury charge on first-degree reckless homicide was not supported by the evidence. The trial court did instruct the jury on the lesser-included offense of felony murder.

A trial court engages in a two-step analysis in determining whether to submit a lesser-included

---

[20] Section 940.03, STATS., reads:

**Felony murder.** Whoever causes the death of another human being while committing or attempting to commit a crime specified in s. 940.225 (1) or (2) (a), 943.02, 943.10 (2) or 943.32 (2) may be imprisoned for not more than 20 years in excess of the maximum period of imprisonment provided by law for that crime or attempt.

[21] Section 940.02(1), STATS., reads:

**First-degree reckless homicide.** (1) Whoever recklessly causes the death of another human being under circumstances which show utter disregard for human life is guilty of a Class B felony.

offense jury instruction. *See State v. Muentner,* 138 Wis. 2d 374, 387, 406 N.W.2d 415, 421 (1987). First, the court must determine whether the crime is a lesser-included offense of the charged crime. *Id.* Next, the court must weigh whether there is a reasonable basis in the evidence for a jury to acquit on the greater offense and to convict on the lesser offense. *Id.* If both steps are satisfied, the trial court should submit the lesser-included instruction to the jury if the defendant requests it. *See id.* A trial court commits reversible error if it refuses to submit an instruction on an issue that is supported by the evidence. *State v. Weeks,* 165 Wis. 2d 200, 208, 477 N.W.2d 642, 645 (Ct. App. 1991). Whether the evidence adduced at trial requires a jury charge on the lesser-included offense instruction is a question of law that we review *de novo. Id.* In addition, we must view the evidence in a light most favorable to the defendant. *State v. Davis,* 144 Wis. 2d 852, 855, 425 N.W.2d 411, 412 (1988).

The State argues on appeal, however, that we need not reach the two-step analysis because the trial court submitted a lesser-included instruction for felony murder. Thus, the State argues that, based upon our holding in *State v. Truax,* 151 Wis. 2d 354, 444 N.W.2d 432 (Ct. App. 1989), any failure by the trial court to submit the lesser-included jury instruction for first-degree reckless homicide was harmless error. The State is incorrect.

In *Truax,* a jury was instructed on first-degree and second-degree murder.[22] *Id.* at 361, 444 N.W.2d at 436.

---

[22] *State v. Truax,* 151 Wis. 2d 354, 444 N.W.2d 432 (Ct. App. 1989), applied the homicide statutes in existence prior to the major revision of Wisconsin's homicide code in 1987. *See* 1987 Wis. Act 399. First-degree murder under the old statutes is analogous to first-degree intentional homicide under the cur-

The defendant requested the lesser-included jury instruction for homicide by reckless conduct,[23] which the trial court denied. *Id.* at 358, 444 N.W.2d at 434. The issue presented in *Truax* was the "classic" lesser-included offense situation in which "the greater offense contains all of the elements of the lesser-included and has at least one additional element [thereby allowing] the jury to disregard the lesser-included offense if agreement is reached on a finding of guilt on the greater offense." *Id.* at 362 n.2, 444 N.W.2d at 436 n.2. Additionally, we stated: "The purpose behind requiring that instructions on lesser-included offenses be given, when the evidence warrants it, is to avoid subjecting juries to the choice of either acquitting altogether or finding the defendant guilty of the higher degree where it is convinced only of the lower degree." *Id.* at 363, 444 N.W.2d at 436. Therefore, in the "unique situation" presented to us in *Truax*, we found that any error in failing to submit the lesser-included instruction was harmless because if the jury "had doubt . . . as to the propriety of a guilty finding on first-degree murder, [the jury] would have been able to consider second-degree murder as an alternative to outright acquittal." *Id.* at 363-64, 444 N.W.2d at 436-37. Stated another way:

> "[I]f a defendant is charged with offense 'A' of which
> 'B' is the next immediate lesser-included offense

---

rent statutes. Judicial Council Committee Note, § 940.01, STATS. Second-degree murder is analogous to first-degree reckless homicide. Judicial Council Committee Note, 1988, § 940.02, STATS.

[23] Homicide by reckless conduct is analogous to second-degree reckless homicide. Judicial Council Committee Note, 1988, § 940.06, STATS.

(one step removed) and 'C' is the next below 'B' (two steps removed), then when the jury is instructed on 'B' yet still convicts the accused of 'A' it is logical to assume that the panel would not have found him guilty only of 'C' (that is, would have passed over 'B'), so that the failure to instruct on 'C' is harmless."

*Id.* at 364, 444 N.W.2d at 437 (quoting *State v. Abreau,* 363 So. 2d 1063, 1064 (Fla. 1978)).

Contrary to the suppositions of the State, the situation presented to us in this case is not analogous to *Truax.* In *Truax,* we were faced with one greater offense and two lesser-included offenses where one of the lessers was also a lesser-included offense of the other lesser: that is, "A" was the greater offense; "B" was a lesser-included offense of "A"; and "C" was a lesser-included offense of both "A" and "B." In the present case, both felony murder and first-degree reckless homicide are lesser-included offenses of first-degree intentional homicide. *See* § 939.66, STATS.[24] It is unclear, however, whether first-degree reckless homi-

---

[24] Under § 939.66, STATS.:

**939.66 Conviction of included crime permitted.** Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:

. . . .

(2) A crime which is a less serious type of criminal homicide than the one charged.

First-degree intentional homicide is the only form of homicide punishable by a class A penalty, *see* § 940.01(1), STATS.; thus, all other forms of homicide are "less serious" types of criminal homicide and are thereby lesser-included offenses of first-degree intentional homicide. *See Harris v. State,* 68 Wis. 2d 436, 441-42, 228 N.W.2d 645, 647-48 (1975) ("seriousness" of offense is based upon the maximum penalty that may be imposed"); *see*

cide or felony murder is a lesser-included offense of the other.

In *State v. Davis,* 144 Wis. 2d 852, 425 N.W.2d 411 (1988), the supreme court, when interpreting the prior homicide statutes, concluded that the predecessor felony-murder statute, *see* § 940.02(2), STATS. (1985-86), was a lesser-included offense to the predecessor first-degree reckless homicide statute, *see* § 940.02(1), STATS. (1985-86) ("depraved mind" murder). *Id.* at 861, 425 N.W.2d at 415. The court based its decision on a comparison of the potential maximum penalty of both felony murder and depraved mind murder. *Id.* at 859-61, 425 N.W.2d at 414-15; *see supra* note 24 (discussing "seriousness" of penalty as method of determining whether one form of homicide is a lesser-included offense to another homicide under § 939.66(2), STATS.). Under the old statutes, felony murder was punishable by a maximum sentence of twenty years imprisonment. *Davis,* 144 Wis. 2d at 859-60, 425 N.W.2d at 414-15.[25] "In contrast, when a defendant was convicted of depraved mind murder and an underlying felony, a combination comparable to the hybrid crime of felony murder, a potential maximum sentence of forty years could be imposed." *Id.* at 860-61, 425 N.W.2d at 414-15. The supreme court noted that its analysis in *Davis* was

*also State v. Davis,* 144 Wis. 2d 852, 857, 425 N.W.2d 411, 413 (1988).

[25] In *State v. Gordon,* 111 Wis. 2d 133, 330 N.W.2d 564 (1983), the supreme court proscribed multiple punishments for both felony murder and the underlying felony. *Id.* at 141-42, 330 N.W.2d at 570. Thus, a defendant convicted of felony murder could not be punished for the underlying felony, but would face only the twenty year maximum sentence prescribed under the felony-murder statute. *Davis,* 144 Wis. 2d at 859-60, 425 N.W.2d at 414.

limited to the old statutes and that it was not reaching a conclusion about the revised statutes that are at issue in the present case. *Id.* at 860 n.3, 425 N.W.2d 414-15 n.3. Thus, we are confronted with a novel problem unresolved under the revised homicide code.

Three members of the Wisconsin Judicial Council's Special Committee on Homicide and Lesser Included Offenses, which drafted the revised homicide code, highlighted this problem under the new statutes:

> One other offense that poses the same penalty problem is felony murder under § 940.03. Its maximum penalty is twenty years in excess of the maximum penalty for the underlying felony. All the underlying felonies are class B felonies with a twenty-year maximum penalty except for one: second-degree sexual assault which has a ten-year maximum penalty. If the penalty for a violation of § 940.03 is taken to include the penalty for the underlying felony, it can therefore range from forty years (twenty years plus a completed class B felony) to thirty years (twenty years plus a completed second-degree sexual assault or an attempted class B felony) to twenty-five years (twenty years plus an attempted second-degree sexual assault). Only first-degree intentional homicide has a more serious penalty than the lowest possible penalty for a variation of felony murder.
>
> . . . .
>
> If the *Davis* approach is applied to felony murder under the revised homicide statutes, it is "less serious" than first-degree intentional homicide. Second-degree reckless homicide and the negligent homicides would be "less serious" than felony murder. But, under the *Davis* approach, second-degree intentional homicide and first-degree reckless homicide would both have the same maximum penalty as felony murder if the penalty for the potential

separate charge of the additional felony is considered. [Accordingly], if the uncharged offense is not "less serious" it should not be submitted as a lesser included offense, a result that seems fair in connection with felony murder, since its inclusion in the homicide revision was intended to reach relatively limited situations. Further, there is no evidence of any legislative intent to allow multiple convictions for felony murder and any other homicide offense.

Walter Dickey et al., *The Importance of Clarity in the Law of Homicide: The Wisconsin Revision*, 1989 WIS. L. REV. 1323, 1383-84 (footnotes omitted, material in brackets added).[26]

We concur with the above commentators and conclude that *Davis* should still control under the new homicide statutes. A successful conviction for felony murder adds a possible twenty years to the sentence of the underlying felony. Accordingly, a conviction for felony murder has the same potential maximum penalty as a conviction for first-degree reckless homicide and a conviction on the separate predicate felony. *See Davis,* 144 Wis. 2d at 860 n.3, 425 N.W.2d at 414-15 n.3.

Therefore, it also follows that the *Truax* harmless-error formula does not apply in this case. Instead of the three nested offenses ("A" is greater than "B" is greater than "C"), we are presented with first-degree intentional homicide as "A," felony murder as "B[1]," and first-

---

[26] We note that the "written views of persons intimately involved with drafting legislation are considered authoritative statements of legislative intent." *State v. Oimen,* 184 Wis. 2d 423, 439, 516 N.W.2d 399, 406 (1994). Thus, the law review article written by members of the "Special Committee" is helpful in resolving the issue presented in this case. *See id.* at 438-39, 516 N.W.2d at 405-06.

degree reckless homicide as "B². " Accordingly, since neither of the lesser offenses is a lesser offense of each other, the syllogism at play in *Truax*[27] cannot apply to the situation present in Morgan's appeal. Since the State's harmless error analysis is incorrect, we must complete our analysis of the issue using the two-part test from *Muentner,* 138 Wis. 2d at 387, 406 N.W.2d at 421.

We already stated that first-degree reckless homicide is a lesser-included offense of first-degree intentional homicide. Thus, the first step of our analysis is satisfied and we must next determine whether the evidence presented at trial was such that a jury could acquit on the greater charge of first-degree intentional homicide and convict on the proposed lesser-included instruction for first-degree reckless homicide. After reviewing the evidence presented at trial, we agree with the trial court that even when viewing the totality of the evidence in a light most favorable to Morgan, a reasonable jury could not have acquitted her of first-degree intentional homicide and convicted her of first-degree reckless homicide.

Several witnesses, including Morgan's co-defendant, testified that Morgan shot Adams at very close range. The forensic pathologist testified that the gun was close to Adams's neck when it was fired, and that the trajectory of the bullet passed through Adams's vital areas. Morgan argues that there was evidence that: (1) Morgan's eyes were closed when she shot Adams; (2) Morgan did not take aim at Adams, but just pointed the gun and fired; and (3) Morgan only fired

---

[27] " '[W]hen the jury is instructed on "B" yet still convicts the accused of "A" it is logical to assume that the panel would not have found him guilty only of "C." ' " *Truax,* 151 Wis. 2d at 364, 444 N.W.2d at 437 (citation omitted).

one shot at the top of Adams's shoulder. Even viewing this evidence most favorably to Morgan, we conclude that a reasonable jury would not acquit her of first-degree intentional homicide.

■■■

The evidence shows that at the time Morgan fired the gun, it was almost touching Adams's body. Even if Morgan had her eyes closed, the propinquity of the intentionally pointed gun to a vital area of Adams's body raises the presumption of Morgan's intent to kill Adams. *See State v. Kramar,* 149 Wis. 2d 767, 793, 440 N.W.2d 317, 328 (1989) ("[W]hen one intentionally points a loaded gun at a vital part of the body of another and discharges it, it cannot be said that [the person] did not intend the natural, usual, and ordinary consequences."); *Cupps v. State,* 120 Wis. 504, 512-13, 97 N.W. 210, 213 (1904) (stating that bullet fired from pistol at victim's neck, following slightly downward trajectory was fired at "vital part of the body"); *cf. State v. LaTender,* 86 Wis. 2d 410, 424, 273 N.W.2d 260, 266 (1979) (discussing presumption of intent when gun was fired at side of neck thereby damaging spinal cord and causing respiratory paralysis). Thus, under no reasonable view of the evidence was there a basis to acquit Morgan of first-degree intentional homicide and convict her of first-degree reckless homicide. *Muentner,* 138 Wis. 2d at 387, 466 N.W.2d at 421. Accordingly, the trial court did not err by refusing to give the requested lesser-included offense jury instruction of first-degree reckless homicide.

## IV. EXPERT TESTIMONY IN RESPON-SIBILITY PHASE

We next address the two issues arising out of the second, or "responsibility," phase of her bifurcated trial. Morgan argues that her constitutional right to present a defense was violated when the trial court excluded the expert testimony of Psychologist James Garbarino during the responsibility phase of her trial. We review this issue *de novo. Heft,* 185 Wis. 2d at 296, 517 N.W.2d at 498.

Morgan presented the expert testimony of Dr. Charles Ewing, a forensic psychologist, and Dr. Dewey Cornell, a psychologist. Dr. Ewing testified that after reviewing psychological reports prepared by other doctors, reading transcripts of prior hearings, and examining Morgan for six hours, it was his expert medical opinion that Morgan was suffering from both brief reactive psychosis and post-traumatic stress disorder at the time of Adams's homicide, and that Morgan could neither appreciate the wrongfulness of her conduct nor conform her conduct to the requirements of law. Dr. Cornell testified that it was his expert opinion that Morgan suffered from borderline personality disorder, brief reactive psychosis, and post-traumatic stress disorder at the time of the offenses; and that she could not appreciate the wrongfulness of her actions. Both doctors testified that their diagnoses were complementary, not contradictory to each other. Additionally, they both testified that the violent events that took place in Morgan's life supported their respective diagnoses that she suffered from post-traumatic stress disorder.

Morgan then sought to introduce the testimony of Dr. James Garbarino, a psychologist who had expertise

442

in the development of post-traumatic stress disorder in children living in war-torn and other violent areas. The trial court excluded the evidence, concluding that the testimony would be a "waste of time" because it was cumulative of the testimony of Ewing and Cornell, and that it was irrelevant. Morgan made an offer of proof, presenting the testimony of Garbarino.

As stated above, the trial court has wide discretion in excluding or admitting evidence. *Evans,* 187 Wis. 2d at 77, 522 N.W.2d at 557. If the trial court validly exercises its discretion, we will not reverse its decision. *Id.* Further, the question is not whether the reviewing court agrees with the trial court's decision, but whether appropriate discretion was exercised. *See State v. Hamm,* 146 Wis. 2d 130, 145-46, 430 N.W.2d 584, 591 (Ct. App. 1988). Indeed, this court will generally probe for reasons to sustain a trial court's discretionary ruling, *see State v. Thompson,* 146 Wis. 2d 554, 559, 431 N.W.2d 716, 718 (Ct. App. 1988), and we will affirm the decision if the trial court reaches a correct result, even if derived from a wrong reason. *See State v. Marhal,* 172 Wis. 2d 491, 494 n.2, 493 N.W.2d 758, 760 n.2 (Ct. App. 1992).

The trial court erred when it concluded that Dr. Garbarino's testimony was irrelevant to the responsibility phase of Morgan's bifurcated trial. We disagree with the trial court's conclusion that this testimony would have no relevancy to the issues presented by Morgan in her bid to show that she suffered from the disorder at the time of the offenses. As the offer of proof shows, Garbarino would have testified to the development of post-traumatic stress disorder in children placed in extremely violent or stressful situations.

Such testimony was clearly relevant in the second phase of the bifurcated trial, where Morgan was attempting to show how post-traumatic stress disorder should negate her criminal responsibility (not her guilt) for her actions. Dr. Garbarino's expert testimony could have, *inter alia*, assisted the jury in understanding the development of post-traumatic stress disorder in children, the minimal standard necessary under RULE 907.02, STATS.

The trial court, however, could properly conclude that the testimony was cumulative to the testimony of Doctors Ewing and Cornell. Cumulative testimony, even if relevant, may be excluded. *See* RULE 904.03, STATS.; *State v. Lenarchick,* 74 Wis. 2d 425, 448, 247 N.W.2d 80, 93 (1976). Dr. Ewing testified about post-traumatic stress disorder and its effect on Morgan. Likewise, so did Dr. Cornell. Morgan argues that Dr. Garbarino's expertise was distinct from the other experts and that his testimony would have focused on the exposure of children to violence in foreign war zones and a comparison to abused children. We are not persuaded. The trial court could properly conclude that the supposed distinctive subject matter of Dr. Garbarino's testimony was not sufficiently material to the facts at issue in this case—Morgan did not grow up in a foreign war zone.[28] As such, Dr. Garbarino's testimony was cumulative to that of Doctors Ewing and Cornell. Accordingly, the trial court could properly exclude Dr.

---

[28] We also note Dr. Garbarino never clinically examined Morgan. While this failure to personally examine Morgan does not automatically make his testimony irrelevant, it does support the trial court's conclusion that nothing further would be gained by having Dr. Garbarino testify in addition to Doctors Ewing and Cornell.

Garbarino's testimony on RULE 904.03 cumulativeness grounds. Thus, while the trial court erred in excluding the proffered evidence on relevancy grounds, it reached the correct result by excluding the evidence on cumulativeness grounds. *See Marhal,* 172 Wis. 2d at 494 n.2, 493 N.W.2d at 760 n.2.

Additionally, Morgan's right to present a defense was not violated because she was able to present the testimony of Doctors Ewing and Cornell, which explained post-traumatic stress disorder, discussed their diagnoses that Morgan suffered from the disorder, and opined that the violent experiences in Morgan's life could lead to post-traumatic stress disorder. Any error in excluding Dr. Garbarino's cumulative testimony was harmless beyond a reasonable doubt. *See State v. Hollingsworth,* 160 Wis. 2d 883, 897, 467 N.W.2d 555, 561 (Ct. App. 1991) (exclusion of expert testimony was harmless because record was "replete" with cumulative evidence).

## V. THEORY OF DEFENSE INSTRUCTION

Finally, Morgan contends that the trial court erred when it denied her request to give the jury her "theory of the defense" jury instruction at the close of the second phase of the bifurcated trial. We disagree.

Morgan requested that the following "theory of the case" instruction be given to the jury:

> It is Felicia Morgan's position that brief reactive psychosis, borderline personality disorders and post traumatic stress disorders are all mental diseases as that term is used in Wisconsin law.
>
> It is further her position that, with respect to the robbery of Mercedes C[.] and the killing of Brenda Adams, she has proven by the greater weight of the credible evidence that she suffered

from these diseases on the night of October 26, 1991, and that as a result of them she lacked substantial capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law and, for this reason, she should be found not guilty of these two offenses by reason of mental disease.

The trial court refused to give the special instruction, concluding that WIS J I—CRIMINAL 605[29] was sufficient

---

[29] WISCONSIN J I—CRIMINAL 605 reads:

You have just heard testimony about the defendant's mental condition at the time of the offense. You will now be asked to determine whether the defendant is responsible for the criminal conduct.

Before you may find that the defendant is not responsible for his criminal conduct, the defendant must satisfy you to a reasonable certainty by the greater weight of the credible evidence that at the time the crime was committed, he had a mental disease as a result of which he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

This issue will be presented to you in the form of two questions.

The first question is: At the time the crime was committed, did the defendant have a mental disease? If you answer the first question "yes," you will be asked to answer the second question which is: As a result of the mental disease, did the defendant lack substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law?

The first question is: At the time the crime was committed, did the defendant have a mental disease?

Mental disease is an abnormal condition of the mind which substantially affects mental or emotional processes.

You are not bound by medical labels, definitions, or conclusions as to what is or is not a mental disease.

You should not find that a person is suffering from a mental disease merely because he may have committed a criminal act, or because of the unnaturalness or enormity of such act, or because a motive for such act may be lacking.

Temporary passion or frenzy prompted by revenge, hatred, jealousy, envy, or the like does not constitute a mental disease.

and the correct jury instruction on the issue of Morgan's criminal responsibility.

An abnormality manifested only by repeated criminal or otherwise antisocial conduct does not constitute a mental disease.

A voluntarily induced state of intoxication by drugs or alcohol or both does not constitute a mental disease.

A temporary mental state which is brought into existence by the voluntary taking of drugs or alcohol does not constitute a mental disease.

Chronic use of drugs or alcohol may produce a condition that can constitute a mental disease if the condition has become permanent.

If you are satisfied to a reasonable certainty by the greater weight of the credible evidence that the defendant had a mental disease at the time the offense was committed, you must answer the first question "yes" and go on to answer the second question. If you are not so satisfied, you should answer the first question "no," and you need not consider the second question.

The second question is: As a result of the mental disease, did the defendant lack substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law? Before you may answer this question "yes," you must be satisfied that the defendant's mental disease caused a substantial impairment in his capacity to understand that what he was doing was wrong or to conform his conduct to the requirements of law.

If you are satisfied to a reasonable certainty by the greater weight of the credible evidence that as a result of a mental disease at the time the offense was committed the defendant lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law, you must answer the second question "yes." If you are not so satisfied, you should answer the question "no."

If you answer both of these questions "yes," the defendant will be found to be not responsible for the offense, and he will be committed to the Department of Health and Social Services and will be placed in an appropriate institution unless the court determines that the defendant would not pose a danger to himself or to others if released under conditions ordered by the court. In deciding whether the defendant is responsible for the criminal conduct, you are to consider only the issue of the defendant's mental condition at the time the offense was committed.

A trial court has wide discretion in presenting instructions to the jury. *State v. Amos,* 153 Wis. 2d 257, 278, 450 N.W.2d 503, 511 (Ct. App. 1989) We will not reverse such a determination absent an erroneous exercise of discretion. *Id.* Further:

> If [the trial court's] instructions adequately cover the law applied to the facts, a reviewing court will not find error in refusing special instructions even though the refused instructions would not be erroneous. A defendant is entitled to an instruction on a valid theory of defense, but not to an instruction that merely highlights evidentiary factors. Such instructions are improper, and trial courts are correct if they reject them.

*Id.* at 278, 450 N.W.2d at 511 (citations omitted).

The trial court's use of the standard instruction was not an erroneous exercise of discretion. The standard jury instruction given to the jury adequately and correctly stated the applicable law governing the issue of Morgan's responsibility for her actions. It provided the jury with an accurate definition of "mental disease" under Wisconsin law. It also assigned the correct burden of proof. Thus, we conclude that the trial court could properly reject Morgan's "theory of the case" special instruction, and in doing so, it did not erroneously exercise its discretion.

## VI. SUMMARY

In summary, we conclude that: (1) the trial court properly excluded, during the guilt phase of Morgan's

---

The law provides that, in this case, the verdict is valid only if at least 10 members of the jury have agreed to it.

bifurcated trial, expert testimony on post-traumatic stress disorder and expert and lay testimony on Morgan's psycho-social history because the proffered evidence was irrelevant to any issue in the first phase of her trial; (2) the trial court did not err by refusing to give a requested lesser-included offense instruction because there was no reasonable basis in the evidence for the jury to acquit Morgan of first-degree intentional homicide and convict her of first-degree reckless homicide; (3) the trial court's exclusion of a psychologist's expert testimony from the responsibility phase of Morgan's trial did not violate her right to present a defense because the evidence was cumulative to expert evidence testimony she already presented; and, finally, (4) the trial court properly rejected Morgan's "theory of the case" special jury instruction because the standard instruction was adequate for the facts at issue and correctly stated the applicable law. For the foregoing reasons, we affirm.

*By the Court.*—Judgment affirmed.

SCHUDSON, J. (*concurring in part; dissenting in part*). In the first sentence of its discussion, the majority casts this case in a polemical mold that confines the analysis. The majority claims:

> This case presents another attempt to expand the scope of "mind science" testimony within the framework of Wisconsin's "insanity plea" bifurcated trial system.

Majority op. at 403. Now where does that leave anyone who would dare to disagree? After all, the majority seems to ask, who would ever want to open our courtroom doors to charlatans of "mind science"? Who would ever want to expand the "insanity" defense?

449

To remove this case from its polemical mold, we would do well to begin by identifying the central issue in this appeal: whether the trial court erred in excluding evidence in the first phase of Morgan's bifurcated trial that, she maintains, would have supported her theory that she was guilty of first-degree reckless homicide rather than first-degree intentional homicide.

Therefore, particularly in light of the apparent misconceptions that may be surrounding this case, we also would do well to declare what this case is *not* about, in contrast to its real questions:

(1) This appeal is not about whether Felicia Morgan committed a ghastly crime—she did and, on that point, there is no dispute. The question, however, is whether she committed first-degree intentional homicide or first-degree reckless homicide.

(2) This appeal is not about whether Felicia Morgan will be incarcerated for her crimes—she does not challenge the prison sentences for four counts of armed robbery, one count of attempt armed robbery, and one count of robbery. The question is whether her *additional* confinement will be in prison for intentional homicide, or in a mental hospital for reckless homicide if, as she maintains, she did not intend to kill at the moment she pulled the trigger.

(3) This appeal is not about whether our courts are going to be fooled by some new-fangled "urban psychosis" defense.[1] The question is whether the trial court erred in failing to allow the jury to consider evidence

---

[1] Although the media may have offered insightful and provocative commentary using these words, *see, e.g.,* Peggi Taylor, *Urban Psychosis: Social History As A Defense Is On The Rise,* SHEPHERD EXPRESS, Sept. 15-22, 1994, at 6; Julie Gannon Shoop, *Criminal Lawyers Develop "Urban Psychosis" Defense,* TRIAL,

arguably related to a most traditional defense—"lack of intent."

The Wisconsin Supreme Court explained that "ordinarily admissible evidence which tends to prove the state of mind of the defendant" is relevant to the issue of "intent" in the first phase of a bifurcated trial. *Steele v. State,* 97 Wis. 2d 72, 97-99, 294 N.W.2d 2, 14 (1980). Providing clarification five years later, the supreme court further explained "that either psychiatric testimony or lay testimony detailing the psychiatric and personal history of the defendant may be admitted, if relevant, to cast doubt upon or to prove the defendant's intent to commit the crime charged." *State v. Flattum,* 122 Wis. 2d 282, 303, 361 N.W.2d 705, 716 (1985).

Is PTSD evidence admissible to cast doubt upon a defendant's intent? Perhaps. As the majority acknowledges, evidence of chronic abuse is admissible on behalf of battered women to support theories of defense that would reduce or eliminate their culpability in cases where they killed their abusers. *See State v. Richardson,* 189 Wis. 2d 418, 423-428, 525 N.W.2d 378, 380-382 (Ct. App. 1994) (trial court erred in excluding psychologist's testimony on "battered woman's syndrome" to establish self-defense by showing defendant's behavior consistent with profile of a battered woman); *State v. Felton,* 110 Wis. 2d 485, 504-516, 329 N.W.2d 161, 170-175 (1983) (counsel was ineffective for failing to present theory to refute "intent" and support heat-of-passion defense). The majority, however, distinguishes Morgan's defense in this case from those offered by the battered women in *Felton* (heat of passion) and *Richardson* (self-defense), explaining that "Morgan has not

August 1993, at 12, the record establishes that Morgan did not pursue any theory of defense in these specific terms.

shown how evidence of post-traumatic stress disorder in this case is *relevant to any legislatively recognized privilege or defense* in the guilt phase of her trial." Majority op. at 424 (accent added).

Is PTSD relevant to any recognized defense? As the majority concedes, PTSD evidence indeed may be relevant to "lack of intent" in the first phase of a bifurcated trial on behalf of a Vietnam veteran to counter evidence of "intent" on charges of first-degree murder. *See State v. Coogan*, 154 Wis. 2d 387, 401, 453 N.W.2d 186, 191 (Ct. App. 1990). How, then, can PTSD evidence be irrelevant to Morgan's "lack of intent" defense—the most fundamental of all *recognized defenses*?

Notably, on appeal, the State implicitly concedes this issue. *With specific reference to the first phase of the trial* and to Morgan's attempt to introduce expert testimony that she suffered from PTSD, the State writes:

> Unless Morgan actually suffered from PTSD at the time she killed Brenda Adams, evidence pertaining to the syndrome and to her past physical and emotional trauma was not relevant to any issue in controversy.

Morgan, of course, agrees because the absolute, logical corollary to the State's concession is that if Morgan actually *did* suffer from PTSD at the time she killed Adams, then PTSD evidence *is* relevant to her intent.[2]

------

[2] The State's concession, in my estimation, goes too far. For PTSD evidence to be relevant, a defendant would have to show not only that he or she actually suffered from PTSD at the time, but also that the PTSD *caused* the criminal act. In this regard, however, Morgan's offer of proof was sufficient. She attempted to offer evidence not only that she suffered from PTSD at the time of the crimes, but also that the PTSD caused a "trance-like

Thus, understandably, Morgan attempted to offer testimony from five psychiatrists who diagnosed her PTSD, and from numerous lay witnesses who would have described her life experiences that, the psychiatrists concluded, were the sources of her PTSD. *See Flattum*, 122 Wis. 2d at 303, 361 N.W.2d at 716 ("lay testimony" also admissible to detail the "personal history of the defendant . . . to cast doubt upon . . . the defendant's intent"). Curiously, although the majority acknowledges that "Morgan sought to introduce expert and lay testimony in support of the defense theory that she suffered from post-traumatic stress disorder at the time of Brenda Adams's killing, *'which caused [her] to unintentionally act'* at the time of the shooting," the majority then rejects precisely what Wisconsin law may allow. Majority op. at 413 (emphasis added).

The majority contradicts its own acknowledgement of Morgan's theory of defense when it claims that she offered only "the mere diagnosis of post-traumatic stress disorder as a 'blanket' defense" but did not do so either to refute a specific element of the offense or to support a recognized defense. Majority op. at 427. That assertion is inconsistent with the record. In the first place, as noted, Morgan offered not "the mere diagnosis" of PTSD, but rather, the diagnosis in combination with its actual *causation* of her actions. *See* majority op. at 423–424 n.16. In the second place, just as the majority had conceded earlier, Morgan attempted to offer PTSD evidence both to refute a specific element—intent, and to support a recognized defense—lack of intent. *See* majority op. at 413–414. In

state" in which "she was re-experiencing the trauma of the previous robbery" in which she had been the victim. The State did not argue and the trial court did not rule that Morgan's offer of proof was insufficient.

the terminology of *Flattum*, she sought to have the jury consider both psychiatric and lay testimony "detailing" her PTSD "to cast doubt upon [her] intent to commit the crimes charged." *Flattum*, 122 Wis. 2d at 303, 361 N.W.2d at 716. Under that language in *Flattum*, and as implicitly conceded by the State, the jury would have been entitled to that evidence.[3]

Thus, this case probes whether the trial court erred in denying Morgan a fundamental theory of defense that the Wisconsin Supreme Court has accepted on behalf of others—lack of intent based on post-traumatic stress disorder. Legally and viscerally therefore, this case also may expose a conflict between attitude and law; between denial and confrontation with our society's most grotesque reality.

If the *law* allows the introduction of PTSD evidence on the issue of "intent," can a court reject it nonetheless because of the *attitude* that such evidence, while admissible to help a jury understand the background of battered adults, is not admissible to help a jury understand the background of a ravaged child? If the grotesque reality is that rapacious, murderous violence to children in their homes and on their streets causes PTSD that, in turn, can cause trance-like traumatic flashbacks comparable to those experienced by Vietnam veterans, can a court close a jury's eyes to the connection between a child's alleged PTSD and her possible lack of "intent"?

---

[3] This also necessarily would lead to the conclusion that the trial court erred in denying the lesser-included offense instruction on first-degree reckless homicide. Obviously, if the jury concluded that because of PTSD Morgan did not intend to kill, the jury then would have had a reasonable basis for acquittal on first-degree intentional homicide and conviction on first-degree reckless homicide.

Still, although the language of *Steele* and *Flattum* provides substantial support for Morgan's argument, my comments must remain tentative. *Steele* allowed for "ordinarily admissible evidence" on the subject of intent in the first phase. *Steele* at 98-99, 294 N.W.2d at 14. By what measure may we determine whether PTSD evidence is "ordinarily admissible"? Although *Flattum* would seem to offer added support for Morgan's argument, *Flattum* was not a case involving a bifurcated trial. Part of the difficulty in the analysis of this issue may derive from *Flattum's* awkward attempt to graft "intent" analysis from a single phase trial onto the complicated standards of a bifurcated trial. Morgan's argument also draws some strength from *Coogan*, but the *Coogan* references to PTSD evidence are somewhat incidental to what seems, at best, a cursory analysis. *See Coogan*, 154 Wis. 2d at 401, 453 N.W.2d at 191.

Thus, we reach a perplexing point where, largely on policy grounds, a determination is needed to define whether the *Steele/Flattum* language and the *Richardson/Felton/Coogan* implications extend beyond the specific facts and defenses of those cases to encompass the PTSD evidence/lack of intent theory. Accordingly, this issue would have been appropriate for certification to the Wisconsin Supreme Court.[4]

---

[4] I agree with the majority's view that the case law leads us into a labyrinth on a dead-end trail. Majority op. at 419–420 n.15. Part of the confusion, I think, comes from the failure of the case law to distinguish a person's general mental "capacity to form . . . criminal intent," *Steele*, 97 Wis. 2d at 98, 294 N.W.2d at 14, from a person's actual incapacity to form "specific intent" at the moment he or she commits a crime. The majority makes the mistake of equating these distinct conditions. *See* majority op. at 423–424 n.16.

Regarding the issues on appeal from the responsibility phase of Morgan's trial, I would only add emphasis to the majority's important recognition of the relevancy of Dr. James Garbarino's testimony, and the majority's acknowledgement that, at times, despite what may be our disagreement with a trial court's discretionary call, we must uphold the trial court's determination under our standard of review.

I would hope, nevertheless, that judges and policymakers everywhere will become familiar with Dr. Garbarino's extraordinary research and writing. *See generally* JAMES GARBARINO ET AL., CHILDREN IN DANGER: COPING WITH THE CONSEQUENCES OF COMMUNITY VIOLENCE (1992); JAMES GARBARINO ET AL., NO PLACE TO BE A CHILD: GROWING UP IN A WAR ZONE (1991); James Garbarino et al., *What Children Can Tell Us About Living in Danger*, 46 AM. PSYCHOLOGIST 376 (1991).[5] Dr. Garbarino's work is more than "relevant." His scholarship exposes the devastation of children throughout the world, pierces the conscience of those who are able to shed denial, and motivates all who will listen, learn, and fight for the protection of children.

---

[5] *See also* ALEX KOTLOWITZ, THERE ARE NO CHILDREN HERE: THE STORY OF TWO BOYS GROWING UP IN THE OTHER AMERICA (1991); Gary B. Melton, *Is There a Place for Children in the New World Order?*, 7 NOTRE DAME J.L. ETHICS & PUBLIC POL'Y 491 (1993); Aileen M. Bigelow, Student Article, *In the Ghetto: The State's Duty to Protect Inner-City Children From Violence* 7, NOTRE DAME J.L. ETHICS & PUBLIC POL'Y 533 (1993).