State of Wisconsin, Plaintiff-Respondent,
v.
Robert J. Jacobson, Defendant-Appellant.
No. 03-2023-CR.
Court of Appeals of Wisconsin.
Opinion Filed: May 11, 2004.
Before Cane, C.J., Hoover, P.J., and Peterson, J.
¶ 1 CANE, C.J.
Robert Jacobson appeals from a judgment entered on a jury verdict convicting him of three counts of attempted first-degree intentional homicide and from an order denying him a new trial. He argues the trial court violated his constitutional compulsory process rights by not continuing the trial to allow him to obtain a witness. Jacobson also argues the trial court erred by failing to give the jury the accomplice jury instruction and by denying his motion to strike the jury array. We affirm the judgment and order.

BACKGROUND
¶ 2 An information charged Jacobson with fourteen crimes: four counts of attempted first-degree intentional homicide; five counts of first-degree recklessly endangering safety; four counts of attempted battery to a law enforcement officer; and one count of failure to comply with an officer's attempt to take a person into custody. On August 26, 1999, between 1:15 a.m. and 2:45 a.m., Jackie Brown called the Forest County Sheriff's Department four times to report gunfire. Brown indicated the shots came from Theresa Johnson's residence, where she lived with her two sons, William and Alvin Weso. After Brown's first call, William called Brown and said he was tired of people picking on his family. He said he was going to be waiting on his porch with guns and said he just shot at two officers in a squad car that drove past his house.
¶ 3 Deputies Craig Justice and John Dennee responded to the calls. They stopped their squad car two to three hundred yards from the Johnson residence and heard shots fired. They then drove past the residence and saw lights on inside the house but did not see anyone. They turned around and drove past the residence again, and this time they saw a male individual outside the residence. They heard gunfire again, so they requested back-up.
¶ 4 Four deputies in two squad cars went directly to the Johnson residence. With the squad cars' emergency lights activated and a spotlight shining into the now darkened house, the deputies, by a P.A. system, ordered the occupants out of the house. No one came. While they waited for a search warrant, the deputies attempted to secure the area. Deputy Justice went to one side of the residence and took cover. From his vantage point, he saw William through a window. Moments later, Justice heard the sound of a window opening and heard people exiting the house. He then saw three silhouetted figures, each armed with a "long gun," walking in his direction. Justice identified himself and ordered the individuals to drop their weapons. The subjects opened fire.
¶ 5 The subjects scattered, with two running in one direction and the third running in another. Justice fired at the subject nearest to him. Justice saw another subject shoot at other deputies, and Justice returned fire, hitting the subject, who was later identified as fourteen-year-old Alvin Weso. After Alvin fell, one of the two remaining subjects ran to his side, picked something up, and ran away. William was apprehended on the scene, but the third shooter escaped. The deputies were unable to identify or describe the third shooter.
¶ 6 The police recovered a double-barrel shotgun and a twelve-gauge pump shotgun owned by Jacobson's cousin, who testified he had not seen the weapon since he loaned it to Jacobson. Alvin was taken to the hospital for surgery where he gave a statement to deputy James Odekirk and Rhinelander police officer Ronald Lueneburg identifying the third shooter as "a white guy." However, at trial, Alvin testified he either did not remember giving the statement or it was coerced, given that he was heavily medicated post-surgery.
¶ 7 Fourteen months after the initial statement and after his parents urged him "to tell the truth," Alvin gave a different account. At trial, he testified the third shooter was not a "white guy," but was Jacobson. Alvin said that he was at home with William on the evening of August 25 when Jacobson arrived with guns. Alvin identified the two weapons found at the scene as the guns Jacobson brought. He stated the three of them drank for a couple of hours and Jacobson and William started shooting around midnight. Alvin said that while he was in his bedroom playing video games, the police arrived. He then joined his brother and Jacobson in fleeing the home through a bedroom window. Alvin testified he was unarmed. Alvin further testified he spoke to Jacobson after the shooting, and Jacobson admitted he fired his weapon. Alvin stated Jacobson told him not to implicate Jacobson.
¶ 8 Jonathon Czaplicki, a twenty-two-year-old inmate who met Alvin in the Forest County jail, was later incarcerated in the same cell-block as Jacobson. Czaplicki testified Jacobson admitted that he was involved in the shootings and that he was carrying a double-barrel shotgun.
¶ 9 The jury later convicted Jacobson of three counts of attempted firstdegree intentional homicide. Jacobson eventually moved for a new trial but the trial court denied the request. Jacobson appeals.

DISCUSSION

I. DENIAL OF MOTION FOR A CONTINUANCE
¶ 10 Jacobson first argues the trial court erred by denying his motion for a continuance after deputy Odekirk informed Jacobson's counsel that he would be unavailable for trial, despite being under subpoena to appear. Jacobson indicated he wanted Odekirk to testify to contradict Alvin's testimony that he either did not make the statement implicating the third shooter as a "white guy," or it was coerced while he was heavily medicated post-surgery. Further, Jacobson wanted Odekirk to establish Alvin had the testimonial capacity to give an accurate statement. Jacobson specified that Odekirk would testify he took Alvin's statement on the day of the incident, advised him of his rights, and went through the statement with him and had him sign it. Jacobson claims failure to grant a continuance to secure Odekirk's testimony violated his constitutional right to compulsory process. See U.S. CONST. Amend. VI; WIS. CONST. art. I, § 7.
¶ 11 A motion for a continuance is addressed to the trial court's discretion. State v. Echols, 175 Wis. 2d 653, 680, 499 N.W.2d 631 (1993). As long as the trial court applied the pertinent facts to the correct law and reached a reasonable determination, this court will uphold its decision. State v. Wollman, 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979). If a trial court fails to adequately set forth its reasoning in reaching a discretionary decision, we will search the record for reasons to sustain that decision. McCleary v. State, 49 Wis. 2d 263, 282, 182 N.W.2d 512 (1971).
¶ 12 A denial of a continuance potentially implicates certain constitutional rights and, on appeal, we must determine whether the trial court balanced the defendant's rights against the public interest in the prompt and efficient administration of justice. See Wollman, 86 Wis. 2d at 468; see also Phifer v. State, 64 Wis. 2d 24, 31, 218 N.W.2d 354 (1974). In considering a motion for a continuance due to a witness's absence, the trial court should consider several factors, including whether (1) the testimony of the absent witness is material; (2) the moving party has been guilty of any neglect in endeavoring to procure the attendance of the witness; and (3) there is a reasonable expectation that the witness can be located. Bowie v. State, 85 Wis. 2d 549, 556-57, 271 N.W.2d 110 (1978). "A defendant's failure to make a satisfactory showing on one or more of the three considerations is grounds for denying his or her motion for a continuance." State v. Williams, 2000 WI App 123, ¶ 15, 237 Wis. 2d 591, 614 N.W.2d 11. Additionally, the trial court may consider the extent to which granting the continuance would inconvenience the court, see United States v. Avery, 208 F.3d 597, 602 (7th Cir. 2000), and the opposing party, including its witnesses. See United States v. Flynt, 756 F.2d 1352, 1359-60 (9th Cir. 1985). Balancing all these factors must be done in light of all the circumstances that appear of record. See Wollman, 86 Wis. 2d at 468. Here, the record supports the trial court's denial of Jacobson's continuance request.
¶ 13 When the parties brought Odekirk's unavailability to the court's attention, the court found Jacobson was not guilty of any neglect in endeavoring to procure Odekirk's attendance. The court also found that because no one knew how long or where Odekirk would be on vacation, there was not a reasonable expectation that Odekirk could be located. But the court found the trial could not be continued indefinitely given competing schedules. Further, the court noted the trial had already been adjourned once, and continuing the matter again would severely inconvenience the court, as other trials were already rescheduled to accommodate this one, and the State, since there would be a long delay after resting its case. The State submitted that another officer was present when Alvin gave the statement, Ronald Lueneburg. Noting that Lueneburg may be able to testify to the same effect as Odekirk, the court ordered Lueneburg to appear to testify.
¶ 14 Lueneburg testified he assisted Odekirk's questioning of Alvin at the hospital on the day of the shootings. Lueneburg stated Alvin was alert and appeared to know what he was being asked. Lueneburg also stated Alvin's answers were responsive to questions and were freely and voluntarily given. Even though Alvin was on some type of medication, Lueneburg stated that from his observations he did not feel Alvin was impaired to the extent that he was making inaccurate statements. Lueneburg also testified he witnessed Odekirk reduce Alvin's statements to writing and saw Odekirk read the written statement to Alvin. Lueneburg stated Alvin agreed the statement was true and correct after he made some corrections and signed it. Lueneburg then testified Odekirk also signed the statement to indicate the statement was true and accurate. Lueneburg closed by saying that if he felt there were any problems with the statement, he would have reflected those problems in his report. No problems were reflected in his report.
¶ 15 The trial court found that Lueneburg's testimony "was particularly strong evidence on the line [Jacobson] wished to present." Thus, the court concluded Jacobson was not deprived of a significant witness and would not be prejudiced by Odekirk's failure to testify. We construe the trial court's statements as effectively concluding Odekirk's testimony would be cumulative, thus not material for purposes of deciding whether to grant a continuance. Furthermore, we agree with the court's conclusion.
¶ 16 This is not a case where other witnesses could not prove facts sought to be established. See Elam v. State, 50 Wis. 2d 383, 390, 184 N.W.2d 176 (1971). Nor is this a case where the trial court's denial of Jacobson's continuance request effectively suppressed necessary evidence.[1]See United States ex rel. Robinson v. Pate, 345 F.2d 691, 695 (7th Cir. 1965) ("[D]enial of a fair opportunity to obtain necessary testimony is effectually to suppress it."). While Jacobson indicated he wanted Odekirk to testify, Lueneburg established everything Jacobson hoped to elicit from Odekirk, and Jacobson does not state what additional evidence Odekirk could have provided. Thus, Odekirk's testimony would be cumulative and, therefore, not material. See Elam, 50 Wis. 2d at 390 (where absent witness is not the only witness who can give such evidence, his or her testimony would be cumulative and may not be material). Consequently, Jacobson's compulsory process rights have not be impinged.
¶ 17 Citing State v. Thiel, 2003 WI 111, ¶¶ 78-79, 264 Wis. 2d 571, 665 N.W.2d 305, Jacobson argues the testimony would not have been merely cumulative. There, in an ineffective assistance of counsel analysis, Jacobson argues the supreme court held corroborative credibility evidence cannot be dismissed as cumulative if the additional evidence might have affected the jury's perception of the evidence. He asserts that unless existing evidence conclusively establishes a fact, corroborative evidence going to a key issue in the case is material. We disagree with Jacobson's expansive reading of Thiel.
¶ 18 Thiel was convicted of seven counts of sexual exploitation by a therapist. Because the case "was a classic instance of the `he-said-she-said' dilemma," id., ¶ 46, the victim's credibility was the essential consideration for the jury. However, the supreme court held that Thiel's counsel did not adequately investigate the circumstances surrounding the victim's allegations. A few examples supporting the court's conclusion included that a simple background check would have exposed the fact that the victim did not have a driver's license, even though she claimed to have driven to Thiel's house more than 100 times. Id., ¶ 47. Further, had Thiel's counsel spoken to Thiel's neighbors, counsel would have discovered none of the neighbors recalled seeing the victim, even though the victim claimed to visit Thiel's house three to four times a week. Id. Furthermore, when the victim testified, Thiel's counsel did not adequately establish supporting or highlight inconsistent testimony because counsel did not read all of the discovery. Id., ¶ 64.
¶ 19 The court observed, "The nature of the credibility evidence in this case cannot be characterized as merely cumulative." Id., ¶ 78. Noting that "the veracity of [the victim's] claims of sexual relations with Thiel was not established to such a degree that additional evidence could not have further undermined her credibility and generated a reasonable doubt as to Thiel's guilt," the court stated, "[w]e are concerned about underestimating the importance of cumulative credibility evidence in a case that depends so heavily on the credibility of the complainant." Id., ¶ 79. While some evidence impacting the victim's credibility was presented, Thiel's counsel's failure to investigate and submit "material, discrediting facts pertinent to [the victim's] account of the alleged encounters shakes our confidence in the result of this proceeding." Id. Accordingly, Thiel's counsel was ineffective.
¶ 20 Thiel does not stand for the proposition that anytime a witness's credibility is at the core of a case, a proponent of impeaching evidence must be allowed to parade in front of the jury all witnesses who have knowledge of the same, particular instance that damages that witness's credibility. In other words, Thiel does not require courts to allow impeachment evidence of a particular instance when the evidence has already been proffered. The concern about underestimating the cumulative credibility information in Thiel stemmed from Thiel's counsel's utter failure to explore very material areas of a witness's credibility. Thus, Thiel is more properly framed as requiring counsel to investigate a key witness's credibility and then, at a minimum, attempt to fully paint that witness's credibility portraita portrait comprised of many different strokes, colored from many different relevant instances. Surely some of the strokes may overlap, and surely the trial court may allow the proponent to repaint the same line. See State v. Oberlander, 149 Wis. 2d 132, 140, 438 N.W.2d 580 (1989) (trial court has broad discretion in determining the admissibility of evidence); see also 7 DANIEL D. BLINKA, WISCONSIN PRACTICE: EVIDENCE, § 607.3, at 380 (2d ed. 2001) (trial courts may restrict admission of extrinsic evidence on non-collateral matters under WIS. STAT. § 904.13). However, nothing in Thiel requires the circuit court to extend the proponent of impeaching evidence whatever latitude he or she seeks.
¶ 21 The circumstances in Thiel are not present here. There was no failure to impeach Alvin's credibility in a material way. His condition at the time he made the statement to the police was adequately explored through Lueneburg. Based on what Jacobson indicated he wanted Odekirk to testify to, the trial court recognized Odekirk's testimony would merely have been cumulative to Lueneburg's testimony, and neither in the postconviction proceedings nor on appeal does Jacobson indicate what additional evidence Odekirk would have offered. We conclude the trial court properly determined the testimony would be merely cumulative and thus not material for purposes of deciding whether to grant a continuance. Therefore, we are satisfied the trial court properly exercised its discretion by denying Jacobson's motion for a continuance.[2]

II. ACCOMPLICE JURY INSTRUCTION
¶ 22 Jacobson next argues the trial court erred by denying his request to instruct the jury to view Alvin's testimony with caution because he was an accomplice. See WIS JICRIMINAL 245 (2000). So long as the jury instructions adequately cover the applicable law, the trial court "has wide discretion in instructing the jury based on the facts and circumstances of each case." State v. Wenger, 225 Wis. 2d 495, 502, 593 N.W.2d 467 (Ct. App. 1999); State v. Morgan, 195 Wis. 2d 388, 448, 536 N.W.2d 425 (Ct. App. 1995). As to the accomplice jury instruction, it is error to deny a request for one only where the accomplice's testimony is totally uncorroborated. Linse v. State, 93 Wis. 2d 163, 172, 286 N.W.2d 554 (1980). When the trial court finds sufficient corroboration, the failure to give an accomplice instruction is not an erroneous exercise of the court's discretion. Id. at 171.
¶ 23 In Linse, the supreme court noted there was sufficient corroboration where bomb fragments were found near the location the accomplice said the defendant left a bomb. Id. at 172. Sufficient corroboration also existed where shotgun shells were found where the accomplice testified the defendant fired a shotgun. Id.
¶ 24 Here, Alvin's account was sufficiently corroborated. Alvin testified Jacobson was present at the house and brought two guns, one of which was a double-barrel shotgun. The police found a double-barrel shotgun, which belonged to Jacobson's cousin, at the scene. Jacobson's cousin testified he had not seen the weapon since he loaned it to Jacobson some time ago. This alone is sufficient corroboration. See id. Furthermore, Czaplicki, the inmate in the same cellblock as Jacobson, testified Jacobson admitted his involvement in the shootings, and admitted he was carrying a double-barrel shotgun. Because of the independent evidence corroborating Alvin's testimony, there was no need for an accomplice jury instruction. See id. Moreover, the trial court gave the following jury instructions: WIS JICRIMINAL 140 (burden of proof and presumption of innocence), 190 (weight of evidence), and 300 (credibility of witnesses). Juries are presumed to follow the instructions given to them. State v. Johnston, 184 Wis. 2d 794, 822, 518 N.W.2d 759 (1994). These instructions adequately addressed Jacobson's concerns.

III. DENIAL OF MOTION TO STRIKE JURY ARRAY
¶ 25 Lastly, Jacobson argues the interests of fairness required the court to strike the jury array. He notes that before jury selection began, a Native American activist (who is also Jacobson's uncle), entered the room where potential jurors were congregated and asked if any of them were Native Americans. Jacobson argues the jury array was consequently contaminated, and the trial court erred by denying his motion to strike the array. We disagree.
¶ 26 We interpret Jacobson's argument to be that the jury selected from the array was either subjectively or objectively biased. Subjective bias "is revealed through the words and the demeanor of the prospective juror" and "refers to the prospective juror's state of mind." State v. Faucher, 227 Wis. 2d 700, 717, 596 N.W.2d 770 (1999). "Discerning whether a juror exhibits this type of bias depends upon that juror's verbal responses to questions at voir dire, as well as that juror's demeanor in giving those responses." State v. Kiernan, 227 Wis. 2d 736, 745, 596 N.W.2d 760 (1999). The circuit court sits in the best position to judge this type of bias. Id. Thus, we will uphold the circuit court's factual finding whether a prospective juror is subjectively biased unless it is clearly erroneous. Id.
¶ 27 The court was concerned about the potential impact the activist's question had on the panel and decided any potential bias should be explored with the individual jurors during voir dire. The court stated it would then "take it on a juror by juror basis."
¶ 28 Before voir dire began, the court addressed the panel and, among other things, stated:
What we're looking for is jurors who can give us a decision that's based solely on the evidence that's presented to them and the law that I give the jury in my instructions and not on anything else. We don't want jurors who come to court with certain beliefs or passions or prejudices and making decisions based on their own feelings about any given case.
You must make your decision based solely on the facts as you determine them to be and the law that I give you at the end of the case.
The court reiterated this idea several times during its initial questioning of the prospective jurors.
¶ 29 After eliminating several jurors for cause, due to familiarity with the parties or the case, the court focused its questioning on the activist's question. The court asked the jurors how many remembered the question he asked, but only five jurors raised their hands. The court then posed the same question the activist asked and inquired if any juror had Native American heritage. Two jurors indicated they had. The court reaffirmed the principle that the jurors were not to be swayed by Jacobson's Native American heritage. The court stated:
The law in Wisconsin as the law in every other state and the law federally requires that we treat everyone in court whether it be the defendant, a juror, attorneys, court personnel, or spectators equally under the law. The law applies, the rules apply to all of those people equally without regard to their race, creed, color, sex, national origin, age, handicap, those considerations are wholly improper in making any of the decisions that we make in court whether the decisions are made by the judge, the jury, or anyone else. I advised the man who stepped in here that I would handle the situation and I am attempting to do that at this time.
¶ 30 Most importantly for the subjective bias inquiry, the court then asked, "Is there anyone here who would let their decision in this case, that is, their decision on the verdict in anyway be influenced by issues of race, creed, color, sex, age, handicap, national origin, any of those topics?" One juror, who had extensive involvement with the Native American community, responded that after much soul-searching she felt she could not be impartial. The court thanked her for her candor and excused her.
¶ 31 The district attorney also asked if the activist's question aroused anger in any of the jurors, or if it made any difference that Jacobson was Native American. None of the jurors answered. Jacobson's trial counsel asked if the activist's question caused any of the jurors to think about whether there were any Native Americans on the jury. Some of the jurors raised their hands.[3] Jacobson's trial counsel also asked if anyone was surprised that, given the percentage of Native Americans in the area, there were no recognizable Native Americans on the jury array. Two jurors answered yes, and one of those jurors eventually made the panel.
¶ 32 We agree with the State and conclude the trial court's implicit finding that the jury was not subjectively biased is not clearly erroneous. There is nothing in the jurors' responses to indicate any of them were subjectively biased, nor is there anything in the record as to their demeanor suggesting subjective bias. While one juror indicated surprise at the lack of recognizable Native Americans on the jury panel, this appears to have been nothing more than a sincere observation.[4]
¶ 33 Whether jurors are objectively biased presents a mixed question of fact and law. State v. Lindell, 2001 WI 108, ¶ 39, 245 Wis. 2d 689, 629 N.W.2d 223. The circuit court's factual findings will be upheld unless they are clearly erroneous, and we review independently whether those facts fulfill the legal standard of object bias. Id. However, while we ordinarily do not defer to the circuit court's determination of a question of law, because a circuit court's conclusion on objective bias is intertwined with factual findings supporting that conclusion, we give weight to the circuit court's conclusion. Id. Thus, "we will reverse its conclusion only if as a matter of law a reasonable judge could not have reached [the trial court's] conclusion." Id. (citation omitted).
¶ 34 Under these circumstances, a reasonable judge could have found the jury array was objectively fair. See id. The fact is that the activist posed a single, open-ended question to the jury array, something along the lines of, "Is anyone in the courtroom a Native American?" Since none of the jurors expressed anger or any other reaction due to the question and, based on the innocuous nature of the query coupled with the extensive voir dire that followed, we uphold the trial court's denial of Jacobson's motion to strike the array.
By the Court.  Judgment and order affirmed.
NOTES
[1] Jacobson contends that affirming his conviction will reinforce the belief among law enforcement officers that they are free to disregard defense subpoenas, thereby eroding public confidence not only in law enforcement, but in the judicial system's willingness to protect a defendant's right to compulsory process. However, as the trial court noted, Odekirk's failure to appear in court implicates the court's power to hold one in contempt.
[2] Jacobson also makes much of the fact that during deliberations, the jury sent the court a question asking why Odekirk did not testify. Thus, he argues, Odekirk's testimony would not have been merely cumulative. However, Jacobson's argument effectively shifts the trial court's discretion on whether to grant a continuancewhich, as indicated above, includes an assessment of whether the absent testimony is materialto the jury. Our concern is whether the trial court properly exercised its discretion at the time it was called upon to rule on Jacobson's motion.
[3] The record is not clear as to how many jurors raised their hands. The court said it saw about six hands, but the jurors were not identified.
[4] Even if it could be argued that the juror's surprise at a lack of recognizable Native American representation on the jury array constitutes evidence of subjective bias, we note that Jacobson did not move to excuse the juror for cause, nor did he use one of his four peremptory challenges to strike the juror.